Docket No. 81911–Agenda 2–November 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TIMOTHY D. BUSS, Appellant.

Opinion filed April 15, 1999.

JUSTICE McMORROW delivered the opinion of the court:

In connection with the August 7, 1995, disappearance and murder of Christopher Meyer, defendant, Timothy D. Buss, was indicted on six counts of first degree murder, three counts of aggravated kidnaping, and one count of aggravated unlawful restraint. Following a trial in the circuit court of Will County, a jury found defendant guilty of all of these charges. The same jury determined that defendant was eligible for the death penalty. After hearing evidence in aggravation and mitigation, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court sentenced defendant to death for first degree murder and imposed sentences of 30 years’ imprisonment and 5 years’ imprisonment for aggravated kidnaping and aggravated unlawful restraint, respectively.

On appeal, defendant argues that this court must grant him a new trial and capital sentencing hearing because of errors relating to 
voir dire
, the denial of his pretrial motion to quash arrest and suppress evidence, errors that occurred at trial, and errors at both stages of the sentencing hearing. Defendant’s death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). We affirm defendant’s convictions and death sentence.

BACKGROUND

At defendant’s 1996 trial, Mika Moulton, Christopher Meyer’s mother, testified that, in August 1995, she and her children lived in Aroma Park, Illinois. During the afternoon of August 7, 1995, she gave 10½-year-old Christopher permission to go to the Aroma Park boat launch on the Kankakee River. Moulton instructed Christopher to return home at 5 p.m. that day. When he left on his bicycle for the boat launch, Christopher was wearing blue shorts, a green patterned T-shirt, Chicago Blackhawks high-top tennis shoes, and Ninja Turtle underwear. When Christopher did not return home that evening, Moulton looked for him without success. She notified police, who began a search for Christopher.

In the days following Christopher’s disappearance, members of the team searching for him found Christopher’s clothing and bicycle in areas around the Kankakee River. Searchers testified that, while dragging the river on August 8, they found one of Christopher’s shoes floating near the Aroma Park boat launch. That same day, searchers found the bicycle Christopher was last seen riding. The bicycle was recovered across the river from the boat launch in a wooded area east of the railroad trestle on Birchwood Drive. During the morning of August 9, 1995, Christopher’s other shoe was found floating in the Kankakee River near the Kankakee Country Club, which is downstream from the Aroma Park boat launch. On August 12, searchers found pieces of Christopher’s clothing in the area around the gravel parking lot for Hunting Area 10 in the Kankakee State Park. On a path leading from the parking lot, there was a piece of Christopher’s T-shirt on the ground, and a pair of Ninja Turtle underwear was hanging in a nearby bush.

While the search for Christopher proceeded, police learned that several individuals had seen Christopher and a man resembling defendant at the boat launch during the afternoon of August 7. Jacob Mailloux, who was 14 years old at the time of trial, testified that he went to the boat launch with his friend Paul Buckner during the afternoon of August 7. As he and Buckner fished at the bayou, an area adjacent to the boat launch, Mailloux saw Christopher talking to a man. Mailloux knew Christopher because he had seen him at the boat launch before. The man with Christopher had dark hair and a mustache and was wearing a turquoise tank top and blue jean cut-off shorts. During a conversation Mailloux had with this man, the man said that he had been raised in Aroma Park, had family in the area, and had just returned from Florida. The man also talked to Mailloux about salt water fishing in Florida. Mailloux noticed that the man’s tackle box contained a filet knife and lures that were too big to be used by fishermen in the Aroma Park area. Although Mailloux was unable to make a positive identification of defendant in court or at the lineup he viewed, he testified that defendant was similar to the man he saw with Christopher.

Fifteen-year-old Edward Meier testified that, around 4 p.m. on August 7, 1995, he was at the boat launch with his friends Dustin and Darren Posing. Meier saw Christopher walk out of the woods on a path leading from the fishing area adjacent to the boat launch. Christopher walked to a car, where he spoke to someone, after which he jogged to the boat ramp to wash mud from his shoes in the river. He then retrieved his bike, which was leaning on a nearby tree. Darren suggested that Christopher ride his bike into the river but Christopher refused, saying he had to be home by 4:30 p.m. Dustin told him it was only 4:17 p.m., but Christopher replied that he had to leave. Meanwhile, the car slowly circled around the parking lot and then drove out of the lot toward Harry’s Bait Shop. Christopher quickly rode out of the parking lot after the car. On August 10, 1995, Meier selected defendant’s car from 25 or 30 cars in the parking lot of the Kankakee County sheriff’s department and identified it as the car he saw at the boat launch on August 7.

Darren Posing’s testimony was essentially the same as Meier’s, except that he did not see Christopher talking to anyone at the boat launch. Posing, who was 12 years old at the time of trial, did, however, see one car in the boat launch parking lot, a gray or dark blue car that appeared to be a 1984 Oldsmobile Ciera. He told police that defendant’s car was similar to the one he saw at the boat launch. In addition, he testified that Christopher rode toward Harry’s Bait Shop when he left the parking lot of the boat launch.

Beth Waselewski testified that she was at the Aroma Park boat launch with her boyfriend, Jason Forbes, on August 7, 1995. She saw Christopher pushing his bike and following a man in his late thirties or early forties. The man wore a dark sleeveless shirt, had a mustache, had dark hair, and was smoking a cigarette. Christopher and this man were walking out of the woods on the path leading from the bayou. Waselewski saw a dark gray four-door car in the parking lot of the boat launch but was unable to tell members of the Kankakee County sheriff’s department whether the car she saw at the boat launch was among the cars she later viewed in the parking lot of the department. She was also unable to tell whether the man she saw with Christopher was in a lineup she viewed, but she testified that it was “very possible” that defendant was that man, and it was “possible” that defendant’s car was the one she saw at the boat launch.

Other individuals saw defendant or defendant’s car in the Aroma Park area around August 7. Charles Henry testified that, in August 1995, he lived east of the trestle on Birchwood Drive. Across the road from his house there was a park between the road and the river. On August 7, 1995, he was driving home from work when he saw a car in the parking area of the park. The car was parked facing him, and there was a man standing behind the car by the open trunk. As Henry drove past the park, he had a side view of the man. He made eye contact with the man when the man turned to look at him.

According to Henry, the man had dark, wavy hair and was wearing blue jeans and a gray T-shirt. Henry did not notice any facial hair on the man, but he did see a filet knife in a leather case protruding from the man’s back pocket. Henry, a fisherman, explained that it was common for fishermen to have this type of leather case and filet knife, which he described as a thin, single-edged, flexible knife. Henry could not remember whether he saw the car and the man when he came home for lunch between 12:30 and 1 p.m. or when he returned home from work between 4:30 and 5:30 p.m.

Henry reported his observations to police on August 9. On August 10, Henry viewed a group of 20 to 25 cars in the parking lot of the Kankakee County sheriff’s department. From these cars, he selected defendant’s car, which he stated looked like the car he saw on August 7. On August 11, Henry viewed a lineup, from which he identified defendant as the person he saw on August 7. Henry also made a courtroom identification of defendant.

Bobbye Fancher testified that, at 12:45 a.m. on August 7, 1995, she was driving to work on Route 113 when she saw an older model silver-blue Spectrum turn in front of her from a dirt road just west of Hunting Area 7 in the Kankakee State Park. At about 9:25 p.m. on August 8, Fancher was driving on the same route when she saw the same car turn onto Route 113 at the same location. The car did not turn on its headlights for one-half to one mile. The man driving the car had a mustache. Fancher contacted police and, after viewing a group of 23 to 35 cars at the police station, she identified the defendant’s car as the one she saw on August 7 and 8. She admitted having worked with defendant’s father at one time but stated that she was unaware that defendant had been arrested for Christopher’s murder when she contacted police about the car she saw. David Buss testified that he and Fancher had had disagreements at work but that they had last worked together 15 to 20 years ago.

According to records from the Illinois Secretary of State, defendant owned a 1986 four-door Chevy Spectrum around the time of Christopher’s murder. In June 1995, defendant obtained Illinois license plates for this car and title was transferred from Florida to Illinois.

Other testimony by some of defendant’s neighbors linked him to Christopher’s disappearance. Candace Adkins testified that, in August 1995, she lived in the same apartment building as defendant. He had moved there from Florida in May of that year. On August 6, her sister returned a hammer that they had borrowed from defendant. The hammer was clean when they returned it to him. Around 1 p.m. on August 7, she saw defendant’s car at the apartment building, but it was gone when she looked for it around 4, 5, or 6 p.m. that day. On August 9, defendant asked Adkins if she knew where he was on Monday (August 7) and told her that he was a suspect in Christopher’s disappearance. Adkins noticed that defendant had three scratches on his forearm when she saw him on August 9.

Candace’s sister, Laura Adkins, testified that she lived with her sister in August 1995 and had seen defendant that summer with a filet knife in a case on his belt. On August 8, she saw him sitting in his car for long periods of time in a daze. He had not acted this way in the past.

Members of the Kankakee police department and Kankakee County sheriff’s department testified concerning their attempts to speak to defendant about Christopher’s disappearance. On August 9, police visited the home of David and Terry Buss, defendant’s father and stepmother. Terry Buss refused to speak to police that morning without an attorney. That afternoon, however, David Buss told police that defendant was living in Joliet with his brother. When police visited defendant’s Joliet address that afternoon, no one was home. Defendant was also not at his place of employment. Police placed defendant’s apartment under surveillance and observed him return home that evening. At around 9 p.m., police saw defendant’s car parked in front of his apartment building but, shortly thereafter, police realized that defendant’s car had disappeared. Their attempts to locate the car that night were unsuccessful.

Wanda Poole, a neighbor of defendant’s in August 1995, testified that she is familiar with defendant’s car. Around 8:40 or 9 p.m. on August 9, she was sitting in her garage when she saw defendant’s car traveling down the alley behind her home at 35 to 40 miles per hour. Although it was dark, the car’s headlights were off.

Theresa Billingsley testified that she was working as a desk manager at the B and P Motel in Braidwood on the night of August 9. A man checked into the motel at about 10 p.m. under the name of Jim Benson. The man was driving a blue-gray, older model, four-door Spectrum with fishing rods in the back window. He was smoking when he registered at the motel and was assigned a smoking room. Billingsley contacted police because she believed that this man resembled the composite sketch on a flier police had distributed regarding Christopher’s disappearance. In response to Billingsley’s call, police placed defendant under surveillance at the motel.

Marsha Pressler testified that she worked as a desk clerk at the B and P Motel during the day on August 10. At around 8:25 a.m., defendant checked out of the motel. After defendant left the motel office, Pressler saw him place a pair of boots in the motel dumpster. Pressler asked another guest at the motel to retrieve the boots from the dumpster and place them in a plastic bag. Pressler gave this bag to Braidwood police officer Keith Kemp, who testified that the boots were “water soaked” but in good condition when he received them.

Kankakee County Deputy Sheriff Brady Bertrand, the police officer assigned to watch defendant at the motel, testified that he also observed defendant place a pair of boots in the motel dumpster and then drive away from the motel in a light blue or gray Chevy Spectrum. Bertrand followed defendant to the Wilmington Dam.

William Treadman, testified that he was at the Wilmington Dam around 9 a.m. on August 10. Defendant approached Treadman and asked whether Treadman had seen him fishing at the Dam before. Treadman responded that he had not.

David Buss explained at trial that, after police came to his house on August 9, he had contacted defendant and advised him to spend the night at a motel around the Wilmington Dam, speak to people at the Dam in the morning to “verify his whereabouts” on August 7, and turn himself in to police.

After Bertrand and defendant arrived at the Dam on August 10, four other officers joined Bertrand. Three of those officers, Lieutenant Gary Mitchell, Detective Rich Sims, and Lieutenant Larry Osenga, approached defendant. Mitchell identified himself and told defendant they wanted to speak to him. Defendant appeared nervous, walked in circles, and did not make eye contact with the officers. In addition, when Sims attempted to take a picture of him, defendant turned his face away and put his hands up to shield his face.

At the request of the police officers, defendant then drove his car to the sheriff’s department. Two officers accompanied defendant to the sheriff’s department in their own cars. Defendant parked his car in the parking lot of the sheriff’s department. While he was inside, police had a towing company bring other similar cars to the parking lot, after which police asked potential witnesses if they recognized any of the cars in the parking lot. That afternoon, after consulting with his attorney, defendant consented in writing to the search of his car. Defendant was arrested on August 10, 1995.

Christopher’s body was found in Will County on August 15, 1995. Will County Sheriff’s Deputy Scott Swearengen testified that he and another deputy were searching the hunting areas of the Kankakee State Park during the early morning hours of August 15. In a clearing at the end of a path leading from the parking area of Hunting Area 7, they found the body of a small child in a shallow grave under a sheet of plywood.

Forensic evidence presented by the State established that the body was that of Christopher and that he had died from multiple stab wounds prior to sunset on August 7. Dr. Edward Pavlik, an expert in forensic odontology, testified that he was asked to assist in identifying the body recovered in Hunting Area 7. Based on the development of the teeth in the body and a comparison of these teeth to photographs of Christopher’s teeth before his death, Pavlik determined that the body belonged to Christopher.

Dr. Larry Blum, an expert in forensic pathology, testified that he performed the autopsy of Christopher’s body. The body was unclothed and showed signs of decomposition. Blum found a contusion to Christopher’s jaw and 52 stab wounds and cuts on the body, primarily to the chest, abdomen, and back. In Blum’s opinion, the stab and slash wounds were made by a sharp, single-edged knife that was relatively long and narrow. This knife could have been a filet knife. There was also evidence that this type of knife had been used to cut Christopher’s genital area; his external genitalia were missing. None of Christopher’s wounds, including one stab wound to his heart and 12 to his lungs, was sufficient to cause immediate death. Blum opined that the cause of death was multiple stab wounds.

Neal Haskell, a forensic entomologist, explained that certain insects are attracted to human remains, sometimes within seconds of death, and lay their eggs in these remains. Based on the stage of development of the insects found in a corpse, a precise estimation of the time of death may be obtained. Haskell analyzed the insects recovered from Christopher’s body, as well as the environmental conditions to which the body had been subjected. He concluded that the time of death was most likely sometime before sunset on August 7.

Other forensic evidence connected defendant to Christopher’s murder. Randy Hartman, a Kankakee County police detective and evidence technician, helped process defendant’s car after defendant consented to the search. He testified that he vacuumed the car and placed the collected debris in sealed bags. On the floor of the back seat, Hartman found a bucket and hammer with mud caked on the claw. There were fishing poles in the back window and a tackle box in the trunk. There was no filet knife in this tackle box, but the box did contain various lures, sinkers, and a salt water fishing hook. There was blood on the carpet of the trunk, as well as on items in the trunk, such as a lug wrench, dent puller, and bottle.

The police also searched defendant’s apartment, as well as his room at the B and P Motel. In the motel dumpster, police found a motel receipt with the name of Jim Benson on it. No filet knife was found in the apartment or at the motel.

Ralph Meyer, a forensic microscopist for the Illinois State Police Forensic Science Lab, testified that he analyzed hairs recovered from defendant’s car and from the T-shirt fragment found in Hunting Area 10. He obtained hair samples from Christopher’s body and from defendant. He stated that the characteristics of two hairs recovered from the front passenger area of defendant’s car matched the characteristics of Christopher’s hair, which was very unique in terms of structure and pigment. Characteristics of a hair found on the T-shirt fragment also matched those of Christopher’s hair.

Kenneth Knight, a forensic scientist with the Illinois State Police Crime Lab and an expert in forensic microscopy, testified that he analyzed soil recovered from the claw of the hammer found in defendant’s car and soil from the grave site. He found that these soil samples were consistent with each other.

Robert Hunton, a forensic scientist with the Illinois State Police and an expert in foot marks testified that he compared a partial footprint found at the grave site to the boots defendant discarded at the B and P Motel. The pattern and size of the right boot was the same as the footprint.

Gail Kienast, a forensic scientist at the Illinois State Bureau of Forensic Sciences and an expert in serology and blood analysis, testified that she analyzed items recovered by police in this case. She determined that there was human blood on the dent puller found in the trunk of defendant’s car. On carpet from the trunk there was a stain of human blood that had soaked through the carpet. There was human blood on a box found at the grave site. There was also blood on the boots defendant had placed in the motel dumpster, although the test to determine whether this blood was human was not positive.

William Frank, the DNA Research Coordinator for the Illinois State Police Forensic Sciences Command and an expert in forensic DNA (deoxyribonucleic acid) analysis, testified that he analyzed DNA extracted from an inhaler prescribed for Christopher, from carpet from the trunk of defendant’s car, from a piece of Christopher’s right femur, and from a bloodstained box found at the grave site. Frank used two methods of DNA analysis: PCR (polymerase chain reaction) and RFLP (restriction fragment length polymorphism). Each of these methods is used to identify particular characteristics of a given sample of DNA. Those characteristics are referred to as the “profile” of that DNA. Because each method of analysis, PCR and RFLP, identifies different characteristics, two different profiles are obtained by subjecting a sample of DNA to both types of analysis.

Frank used the PCR method to analyze DNA found on the inhaler, carpet, femur, and box. The PCR profile of the DNA from each of these items was the same. Frank calculated that this particular DNA profile could be found in one out of 19,000 Caucasian individuals.

Using the RFLP method, which is more discriminating, Frank compared the DNA in blood samples from Christopher’s parents and defendant to the DNA in blood found on the box and carpet. (Because the amount of DNA extracted from Christopher’s inhaler and femur was insufficient for the RFLP method of analysis, Frank used DNA from Christopher’s parents to determine whether the blood from the box and carpet belonged to Christopher.) By comparing the DNA profiles he obtained, Frank determined that the blood on the box and the carpet came from a child of Mika Moulton and James Meyer, Sr., Christopher’s father. Frank calculated that the chance of two Caucasian parents producing a child with the same RFLP DNA profile as the DNA found on the carpet and box was one out of 3.8 million.

Having obtained a PCR and an RFLP profile for the DNA found on the box and carpet, Frank then estimated the frequency of DNA with these both of these profiles in the population. He determined that a person with such DNA would occur in the Caucasian population only 1 out of 419 million times.

The parties stipulated that defendant was 28 years old at the time of trial.

The defense presented the testimony of three witness who believed they saw defendant around the time of Christopher’s disappearance. In an effort to show that such eyewitness identifications are unreliable, the defense then called witnesses whose testimony indicated that defendant was not the individual these three witnesses saw. For example, Kankakee County Deputy Sheriff Marcia Dillon testified that, while she was working at the search command center on August 8 at 6 a.m., she saw a man resembling the composite sketch police had distributed. The man drove into the command center parking lot in a blue-gray, early eighties model Buick, Chevy, or Oldsmobile. Dillon could not positively identify defendant as the driver and testified that defendant’s car was not the car she saw that morning.

Cindy Berglund testified that, around 1 p.m. on August 8, she was at a pond a half hour from Kankakee with her 13-year-old son, David Berglund. A man driving a silver-blue Chevy exited his car and began talking to her son. After seeing defendant’s picture in the newspaper, she believed that the man she saw talking to her son was defendant, and she contacted police. David Berglund testified that the man talked to him about fishing. Both Berglunds 
testified that, if the man they saw was not defendant, he was defendant’s twin. Neither Berglund, however, was able to identify the car they saw from the group of cars police showed them.

In contradiction to Dillon’s and Berglund’s testimony, Michelle Cash, one of defendant’s neighbors, testified that her children did not awaken defendant until 10 a.m. on August 8. In addition, Cash testified that, between 10:30 a.m. and 2 p.m. on August 8, defendant was with her running errands.

Like Berglund, Francis Wood testified that she was at a lake near Wilmington with her grandchildren at about 7:30 or 8:30 p.m. on August 5, 1995, when a man approached her grandson and spoke to him about fishing. He was driving an eighties model dark-gray automobile with a dent on the driver’s side. She contacted police about the incident after seeing a picture of defendant on television. She testified that she believed the man was defendant. Defendant’s father and aunt, however, testified that defendant was at his sister’s wedding and reception on August 5 from 2 to 10:30 p.m.

In addition, to rebut Fancher’s testimony that she saw defendant driving near Hunting Area 7 on the evening of August 8, defendant’s grandmother, Alice Buss, testified that defendant was with her in Kankakee that evening from 6 p.m. to 10 p.m.

Defendant sought to further undermine the identifications of him by the State’s witnesses by presenting the testimony of witnesses who thought they may have seen defendant and Christopher together but who were unable to identify defendant at lineups. For example, Thomas Dellibac testified that, on August 7 at around 5:30 p.m., he saw a boy and a man fishing on the Kankakee River 50 to 100 yards downriver from the Aroma Park boat launch. The boy resembled Christopher and the man looked similar to defendant. Dellibac could not, however, positively identify anyone in the lineup police showed him.

Similarly, Steven Jones testified that, around 4:30 p.m. on August 7, 1995, he saw a man and a blond-haired boy in a car leaving a playground on the Kankakee River in Aroma Park. The car was traveling at a high rate of speed, and there was a 20-inch bicycle in the trunk. Although he first tentatively selected defendant from a lineup he saw in October 1995, he was unable to positively identify the driver of the car.

To show that defendant was not the only man in Aroma Park to have recently arrived from Florida around the time of Christopher’s murder, defendant also presented the testimony of Michael Ingalls, who testified that, around noon on August 8, he had a conversation with a man in Harry’s Bait Shop in Aroma Park. The man said that he had driven to Illinois from Florida. The man was in his late thirties to mid-forties, had black hair and a mustache, and was driving a white compact car.

After hearing this evidence, the jury found defendant guilty of all of the charges against him. The same jury found defendant eligible for the death penalty based on the following three statutory aggravating factors: (1) defendant had been convicted of murdering two or more individuals (720 ILCS 5/9–1(b)(3) (West 1994)); (2) the murder occurred in the course of a felony (720 ILCS 5/9–1(b)(6) (West 1994)); and (3) the murder victim was under the age of 12 and his death resulted from exceptional brutal or heinous behavior indicative of wanton cruelty (720 ILCS 5/9–1(b)(7) (West 1994)). Following a hearing at which extensive testimony concerning aggravation and mitigation was presented, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The circuit court entered judgment on counts I (intentional first degree murder), VIII (aggravated kidnaping), and X (aggravated unlawful restraint) of the indictment. The court sentenced defendant to death for the first degree murder conviction and imposed sentences of 30 years’ imprisonment for the aggravated kidnaping conviction and five years’ imprisonment for the aggravated unlawful restraint conviction.

ANALYSIS

I. Jury Selection

Defendant claims that the 
voir dire 
conducted by the court in this case was deficient in several respects, as a result of which he was denied his right to a fair and impartial jury under the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV). Specifically, he contends: (1) the court erred in refusing to ask certain questions proposed by the defense; (2) the court erred in refusing to grant defense requests that certain jurors be excused for cause; and (3) the manner in which the court conducted 
voir dire 
denied him a fair and impartial jury. According to defendant, these errors require that he receive a new trial and sentencing hearing.

A. Refusal of Defense Voir Dire Questions

Before 
voir dire 
began, the defense made a motion for attorney participation in 
voir dire. 
The circuit court denied this motion. In addition, defendant provided the court with a number of questions for the court to include in its questioning of the venire, as well as a written questionnaire for the jurors. The court had provided the parties with the 23 questions it planned to ask prospective jurors, but the defense argued that the court’s questions did not address certain subjects. The court refused to use defendant’s questions in 
voir dire 
and refused to require jurors to complete the defense questionnaire. The court found that its own questions covered the issues raised by defendant, that questions proposed by defendant were an attempt to “educate” the jurors concerning defendant’s position, and that defendant’s proposed questions concerned matters more appropriate for instruction or argument. During the course of 
voir dire
, defendant asked the circuit court to reconsider its rulings on these 
voir dire 
issues, but the court refused. Defendant now argues that the circuit court’s refusal to ask the questions he proposed violated his constitutional right to an impartial jury by preventing him from identifying unqualified jurors.

Under the fourteenth amendment to the United States Constitution, a defendant in a capital case has a right to an impartial jury for capital sentencing. 
Morgan v. Illinois
, 504 U.S. 719, 727, 119 L. Ed. 2d 492, 501, 112 S. Ct. 2222, 2228-29 (1992); U.S. Const., amend. XIV. This constitutional guarantee includes the right to an adequate 
voir dire 
to permit the identification of unqualified jurors. 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 503, 112 S. Ct. at 2230. Accordingly, 
voir dire 
should “ascertain sufficient information about prospective jurors’ beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.” 
People v. Cloutier
, 156 Ill. 2d 483, 496 (1993).

In Illinois, a defendant’s right to an impartial jury does not include the right to examine jurors himself. 
People v. Peeples
, 155 Ill. 2d 422, 459 (1993). Instead, the circuit court has the primary responsibility for examining prospective jurors, and the manner and scope of 
voir dire 
is within its discretion. 
People v. Williams
, 164 Ill. 2d 1, 16 (1994). So long as the procedures employed by the circuit court provide a reasonable assurance that prejudice, if any, would be discovered, the court’s exercise of discretion will be upheld. 
Peeples
, 155 Ill. 2d at 459.

1. Questions Concerning Consideration of Mitigation

Defendant contends that it was error for the circuit court to refuse to ask prospective jurors questions he submitted concerning their ability to consider and weigh mitigating evidence. According to defendant, as a result of the court’s refusal to ask these questions, he was prevented from intelligently exercising his challenges and denied a fair and impartial jury.

We first address the circuit court’s refusal to ask the following two questions submitted by the defense:

“If the State proves Mr. Buss guilty of first degree murder beyond a reasonable doubt, and also proves he is eligible for the death penalty, a hearing will be held as to whether he lives or dies, where you would hear evidence both against him (aggravation) and for him (mitigation). Would you be able to keep an open mind in considering this question?”

“If the State proves Mr. Buss guilty of first degree murder beyond a reasonable doubt, and also proves he is eligible for the death penalty, are your feelings such that there are no mitigating factors which you feel should prevent imposition of the death penalty?”

The circuit court refused to ask the venire these questions because it found that its own questions covered these concepts. The defendant argues, however, that the court’s questions were general and did not cover the three stages of a death penalty case or the jurors’ ability to consider mitigating evidence.

Defendant’s argument is belied by the record. Before questioning the prospective jurors about their views on the death penalty, the circuit court explained to the venire the three phases of a death penalty case and cautioned the venire not to infer from its discussion of the death penalty that the defendant was guilty or that a particular penalty was appropriate. In addition, during 
voir dire
, the circuit court posed the following questions to the venire:

“Are your feelings about the death penalty such that you would always vote to impose the death penalty in every case where there has been a finding of guilty?”

“Will you be able to keep an open mind and follow the court’s instructions in each phase of this proceeding?”

“Do you understand that simply because a verdict of guilty of the charge of murder of Christopher Meyer is returned, if in fact such a verdict is returned, that a sentence of death does not automatically follow from that?”

Our review of the record convinces us that the concepts contained in defendant’s proposed questions were more than adequately covered by the circuit court’s statements to the venire and its own questions. We are unable to perceive what incremental value defendant’s questions would have had. Consequently, we find that the circuit court did not err in refusing to ask defendant’s proffered questions. See 
Peeples
, 155 Ill. 2d at 460-62 (circuit court did not err in refusing 
voir dire 
questions proposed by the defense when court’s general questions were sufficient to expose areas of bias) .

Defendant also asserts that the circuit court’s failure to ask these other questions he proposed caused jury selection to be constitutionally inadequate:

“Do you understand that it is not a question of counting how many aggravating circumstances the State may try to present versus how many mitigating circumstances the Defense may try to present?”

“Do you understand that the existence of any one mitigating circumstance could outweigh all of the aggravating circumstances?”

“Do you understand the term ‘mitigate’: –it means to make less severe?”

“Would you be able to consider any mitigating factors presented by the defense? a. Would you be able to consider and give full weight to psychiatric/psychological testimony? b. Would you consider mercy as a possible mitigating factor, based upon the evidence?”

The circuit court refused to ask these questions on the basis that they were adequately covered by its own questions or involved matters more appropriate for instructions or argument. On more than one occasion, the circuit court commented to the defense, “I think *** what you are doing here is attempting to educate these jurors with regard to the direction you want your case to go in.”

As the circuit court observed, these four questions, as well as the other questions defendant contends should have been asked of the venire, indicate an attempt by the defense to focus the attention of the venire on mitigation evidence. Although defendant argues that he was entitled to determine whether the venire was biased against psychological evidence or mercy, 
voir dire 
is not to be used to indoctrinate jurors or to impanel a jury with a “particular predisposition.” 
People v. Bowel
, 111 Ill. 2d 58, 64 (1986).

Moreover, under Supreme Court Rules 234 and 431, 
voir dire 
questions “shall not directly or indirectly concern matters of law or instructions.” 134 Ill. 2d R. 234; see also 134 Ill. 2d R. 431. The Illinois Pattern Jury Instructions (IPI) used in this case provide that “[u]nder the law, the defendant shall be sentenced to death if you unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence” and that “[m]itigating factors are reasons why the defendant should not be sentenced to death.” See Illinois Pattern Jury Instructions, Criminal, Nos. 7C.05, 7C.06 (3d ed. 1992) (hereinafter IPI Criminal 3d). By seeking to inform the jury how to weigh mitigating evidence and how to define the term “mitigate,” defendant’s proposed questions undoubtedly involved “matters of law or instructions” in violation of Rules 234 and 431 (134 Ill. 2d Rs. 234, 431). Accordingly, the circuit court acted properly in denying defendant’s request to ask these questions.

Defendant’s reliance on this court’s decision in 
People v. Stack
, 112 Ill. 2d 301 (1986), as authority for the proposition that the circuit court was required to ask members of the venire whether they would consider psychiatric or psychological testimony and mercy is misplaced. In 
Stack
, this court held that it was error for the circuit court to refuse to ask members of the venire about their feelings concerning the defense of insanity. The 
Stack 
court reasoned: “Just as the State is allowed to probe the venire for jurors who would not follow the law of capital punishment, the defendant should be allowed to identify and challenge those prospective jurors who would refuse to follow the statutory law of the insanity defense.” 
Stack
, 112 Ill. 2d at 313.

Contrary to defendant’s argument, the holding in 
Stack 
did not require the circuit court in the case at bar to ask jurors about bias concerning psychological evidence or mercy. While it is appropriate to ask prospective jurors whether they will follow the law (see, 
e.g.
, 
People v. Davis
, 95 Ill. 2d 1, 17-18 (1983)), the purpose of 
voir dire 
is not to ascertain prospective juror’s opinions with respect to evidence to be presented at trial (see
 People v. Howard
, 147 Ill. 2d 103, 135-36 (1991) (circuit court did not err in refusing to ask jurors their attitudes about handguns)). Accordingly, while it was error for the circuit court in 
Stack 
not to ask prospective jurors
 
whether they would refuse to apply a 
statutory 
defense, it was not error for the circuit court in this case to refuse to ascertain prospective jurors’ views on defendant’s 
theory 
of defense (see 
Bowel
, 111 Ill. 2d at 65 (circuit court properly refused questions aimed at selecting jury receptive to theory of defense).

2. Questions Concerning Imposition of the Death Penalty in Particular Circumstances

In addition to requesting questions concerning prospective jurors’ views on mitigating evidence, defendant requested that the circuit court ask members of the venire whether they would automatically impose the death penalty if they found that certain statutory aggravating factors were present in the case. Defendant now argues that the circuit court’s refusal to use these questions denied him his right to an impartial jury for sentencing.

Pursuant to the United States Supreme Court decision in 
Witherspoon v. Illinois
, 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21 (1968), the State is entitled to excuse for cause prospective jurors who would refuse to vote for the death penalty under any circumstance. See also 
Wainwright v. Witt
, 469 U.S. 412, 420-23, 83 L. Ed. 2d 841, 849-51, 105 S. Ct. 844, 850-51 (1985). In 
Morgan v. Illinois
, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992), the Court held that a defendant has a corresponding constitutional right to “life-qualify” a jury; that is, a defendant may exclude for cause prospective jurors who would automatically vote for the death penalty in every capital case. The Court explained in 
Morgan:

“A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.” 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229-30.

To permit a defendant to identify jurors with these views and intelligently exercise his challenges for cause, the 
Morgan 
Court held that a defendant is entitled to have prospective jurors asked whether they would vote for the death penalty in every case involving a conviction for a capital offense, regardless of the circumstances of the case. 
Morgan
, 504 U.S. at 735-36, 119 L. Ed. 2d at 506-07, 112 S. Ct. at 2233.

As required by 
Morgan
, the circuit court in this case included a “reverse-
Witherspoon
”question in its 
voir dire 
inquiry. It asked prospective jurors, 
inter alia
, “Are your feelings about the death penalty such that you would always vote to impose the death penalty in every murder case where there has been a finding of guilt.” Finding this question sufficient to comply with 
Morgan
, the circuit court rejected defendant’s request to ask these additional questions:

“Would you impose the death penalty in all murder cases?”

“Would you impose the death penalty in all murder cases where the deceased was also a child?”

“Would you impose the death penalty in all murder cases which involved the kidnaping and death of a child?”

“Would you impose the death penalty in all murder cases which involved a child under twelve (12) years of age and the death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty?”

“Do you believe that if a person has been previously convicted of murder of a child and is found guilty of first degree murder of another child, that such person should automatically receive the death penalty?

(a) Is that a belief you hold strongly?

(b) Would it be hard for someone to change your mind?

(c) If you were on the jury, would it be difficult or next to impossible for someone to convince you or tell you to set that view aside?”

We find no error in the court’s ruling.

Defendant’s argument that it was error for the circuit court to omit these questions from 
voir dire 
is in direct conflict with several recent holdings by this court. In 
People v. Jackson
, 182 Ill. 2d 30 (1998), we held that 
Morgan 
does not require the circuit court to ask prospective jurors whether they would automatically impose the death penalty in a case involving particular aggravating factors. In 
Jackson
, as in the case now before us, the circuit court asked prospective jurors whether they would “return a verdict directing the court to impose the death penalty in every case where there is a finding of guilty of the offense of murder regardless of what the facts were that you heard?” 
Jackson
, 182 Ill. 2d at 61. The defendant in 
Jackson 
requested that the circuit court also ask the venire, “ ‘Would you impose the death penalty in all murder cases where more than one person was killed?’ ” and “ ‘Would you impose the death penalty in all murder cases where a child is killed?’ ” 
Jackson
, 182 Ill. 2d at 61. The circuit court refused.

We held that the circuit court properly denied the defendant’s request that it ask these additional questions of the venire. 
Jackson
, 182 Ill. 2d at 61. We explained that, under our decisions in 
People v. Brown
, 172 Ill. 2d 1 (1996), and 
People v. Hope
, 168 Ill. 2d 1 (1995), a defendant’s right under 
Morgan 
to “life-qualify” a jury does not include the right to have prospective jurors asked whether they would automatically impose the death penalty in a case involving certain aggravating factors. In 
Brown 
and 
Hope
, we interpreted 
Morgan 
as requiring that jurors be asked only whether they would automatically vote for the death penalty based on a finding of guilt in a capital case. 
Jackson
, 182 Ill. 2d at 61-62. The 
Morgan 
holding, we stated, is intended to permit discovery of jurors to whom the presence of mitigating or aggravating factors is “ ‘entirely irrelevant.’ ” 
Jackson
, 182 Ill. 2d at 59-60, quoting 
Hope
, 168 Ill. 2d at 29-30. Asking jurors whether they would “ ‘vote to impose the death penalty, given a particular set of circumstances, is thus not required by 
Morgan.
’ ” (Emphasis in original.) 
Jackson
, 182 Ill. 2d at 59-60, quoting 
Hope
, 168 Ill. 2d at 29-30.

Defendant presents us with precisely the same argument we rejected in 
Jackson. 
The questions he argues were erroneously omitted from 
voir dire 
in his case are virtually identical to the ones at issue in 
Jackson. 
Defendant presents us with no compelling reason to overturn 
Jackson
, 
Brown
, and 
Hope
, and we decline to do so. Indeed, although 
Jackson 
was decided prior to the filing of defendant’s reply brief, he fails to explain why its holding should not be applied to his case. Under 
Jackson
, 
Brown
, and 
Hope
, the circuit court’s refusal to ask the questions submitted by defendant was proper.

3. “Stand Alone” Question

This court has also recently rejected another of defendant’s arguments regarding 
voir dire 
questions. Defendant argues that it was error for the circuit court to refuse to ask prospective jurors this question: “In the event you are to consider [the death penalty] question, you would have to unanimously vote for death. But if any 
one 
of you were against death, you could so vote alone and stop the entire proceeding. Would you be able to stand alone in this way?” (Emphasis in original.) The circuit court refused to ask this question on the basis that its substance was covered by the court’s instructions and the questions the court already planned to ask the venire.

Defendant argues that the circuit court was required to include his “stand alone” question in its 
voir dire 
inquiry under this court’s decision in 
People v. Zehr
, 103 Ill. 2d 472 (1984). In 
Zehr
, this court held that the circuit court erred when it refused a defendant’s request to have prospective jurors asked whether they understood that defendant was presumed innocent. This court stated:

“We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect.” 
Zehr
, 103 Ill. 2d at 477.

Based on this reasoning, this court held that a question concerning the presumption of innocence was required. 
Zehr
, 103 Ill. 2d at 477.
(footnote: 1)
 Under 
Zehr
, defendant contends that it was error for the circuit court to refuse to ask prospective jurors whether they could stand alone in voting against the death penalty. He asserts that the unanimity requirement contained in section 9–1(g) of the Criminal Code (720 ILCS 5/9–1(g) (West 1994)), is as essential to capital sentencing proceedings as the presumption of innocence is to trial proceedings. According to defendant, “[a] capital juror who could not follow his own conscience when challenged by other jurors and after due deliberation is a conscienceless juror who cannot follow the law or his oath. Such a juror is not impartial.”

We rejected virtually identical arguments in 
People v. Macri
, 185 Ill. 2d 1 (1998). We held that the circuit court in that case did not err in refusing to ask prospective jurors three questions concerning their ability to vote against the death penalty in the event the remaining jurors voted otherwise. In 
Macri
, we acknowledged this court’s holding in 
Zehr 
that prospective jurors should be examined to determine, 
inter alia
, the existence of prejudice against the presumption of innocence, the standard of proof, and the right of a defendant not to testify. We explained, however, that the “stand alone” questions proposed by the defendant did not involve these basic guarantees and were, therefore, not required by 
Zehr. Macri
, 185 Ill. 2d at 38.

We further concluded in 
Macri 
that the defendant’s questions involved matters more appropriately covered by jury instructions. We found that, at both the eligibility and penalty phases of the sentencing hearing, the jury was adequately informed about the unanimity requirement. Thus, the circuit court’s refusal to ask the “stand alone” questions proposed by the defendant did not deprive the defendant of his constitutional rights. 
Macri
, 185 Ill. 2d at 38.

Our holding in 
Macri 
requires that we reject defendant’s argument that the circuit court erred in refusing to ask members of the venire his proposed “stand alone” question. The refused questions at issue in 
Macri 
were essentially the same as the one on which defendant in this case bases his claim of error. In this case, as in 
Macri
, the jurors were given clear instructions concerning the unanimity requirement. Under 
Macri
, we find no error in the circuit court’s refusal to ask prospective jurors defendant’s “stand alone” question.

B. Denial of Defense Challenges for Cause

Next, defendant argues that the circuit court erred by refusing his requests to have venirepersons Laurie Morse, Rhonda Raysel, Marsha Marcinkowski, Irene Keagle, Jeanette Smeets, and John Roop excused for cause. Defendant asserts that, because the circuit court improperly denied his challenges for cause to these jurors, he was forced to use his peremptory challenges to remove them. As a result, he contends, he exhausted his peremptory challenges and was unable to strike venireperson Michael Peterik, whose 
voir dire 
responses suggested that he would be unfavorable to the defense.

With respect to Raysel, Marcinkowski, Keagle, Smeets, and Roop, defendant claims that his challenges for cause should have been granted because these venirepersons indicated that, upon a finding of guilt in a capital case, they would impose the death penalty without regard to the specific facts of the case. After the circuit court denied defendant’s challenges for cause, he excused these jurors using his peremptory challenges.

The United States and Illinois Constitutions give a defendant the right to be tried by a jury that can and will decide his or her case based solely on the evidence presented. 
People v. Olinger
, 176 Ill. 2d 326, 353 (1997). Under 
Morgan v. Illinois
, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992), a defendant has the right to challenge a potential juror for cause if that juror would automatically impose the death penalty upon conviction in a capital case. See also 
People v. Hope
, 168 Ill. 2d 1, 29 (1995). The 
Morgan 
Court explained: “A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.” 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229-30. Permitting a juror with these views to serve on the jury would violate due process. 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229-30.

 The circuit court is in “the best position to observe the potential juror’s demeanor and ascertain the meaning of his or her remarks.” 
People v. Williams
, 173 Ill. 2d 48, 67 (1996). It is, therefore, within the sound discretion of the circuit court to determine whether to permit a challenge for cause.
 People v. Gilliam
, 172 Ill. 2d 484, 511 (1996). Based on our examination of the record, we cannot conclude that the circuit court abused its discretion when it denied defendant’s challenges for cause.

1. Rhonda Raysel

One of the prospective jurors defendant argues should have been excluded for cause is Rhonda Raysel. When asked about her views on the death penalty, Raysel stated: “How I feel is if a person or persons are involved in a crime, that, if they are in their right mind, basically, *** knowing right from wrong, and doing–did like a senseless crime where it did take a life, I think they should give one.” In her responses to subsequent questions, she stated, “I just believe [t]hat *** if they did something totally senseless, then they should really pay for that,” and “Basically, if the crime is *** a really *** terrible crime *** where they know right from wrong, I believe that they should pay for that.”

In making his challenge for cause, defendant argued that these responses indicated that Raysel would impose the death penalty without regard to mitigating evidence. In reviewing a circuit court’s ruling on a challenge for cause, however, the juror’s 
voir dire 
examination must be considered in its entirety. 
Williams
, 173 Ill. 2d at 67. While a prospective juror may be removed for cause when that person’s “views would prevent or substantially impair the performance of his duties as a juror” (
People v. Armstrong
, 183 Ill. 2d 130, 143 (1998)), an equivocal response does not require that a juror be excused for cause (
Williams
, 173 Ill. 2d at 67).

In addition to the responses described previously, Raysel stated during 
voir dire 
that she would not vote to impose the death penalty in every case. Also, in response to follow-up questions the court asked at defendant’s request, Raysel said that she would decide the case according to the law and the evidence and regardless of her own beliefs concerning the death penalty. In light of this clarification of Raysel’s views, the circuit court did not abuse its discretion by concluding that she could be fair and impartial. See 
People v. Keene
, 169 Ill. 2d 1, 11 (1995) (no abuse of discretion to deny challenge for cause to prospective juror who initially indicated that he would vote to impose the death penalty based on a finding of guilt; after the court more fully explained the sentencing process, he stated that he would only vote for the death penalty in an appropriate case).

2. Marsha Marcinkowski

For similar reasons, we reject defendant’s arguments that it was error to deny his challenges for cause to prospective juror Marcinkowski. Marcinkowski stated: “I feel if a person is guilty and the evidence is there, I don’t see any reason why I wouldn’t give a death penalty.” The circuit court asked her three separate times whether she would impose the death penalty in all murder cases in which there was a guilty verdict. After expressing some confusion with respect to the question, Marcinkowski answered this question affirmatively once. Subsequently, she answered it negatively two times. In addition, the court granted defendant’s request that it ask her additional questions for purposes of clarifying her views. In response to these supplemental questions, Marcinkowski stated that her beliefs with respect to the death penalty would not interfere with her consideration of evidence in the case.

Defendant suggests that Marcinkowski’s equivocal answers required her to be excused for cause or required further clarification of her views by the court. We disagree. As we have explained, equivocal responses to 
voir dire 
questions do not require that a prospective juror be excused. See 
Williams
, 173 Ill. 2d at 67. The record indicates that Marcinkowski’s one affirmative response to the circuit court’s “reverse-
Witherspoon
”question was the result of confusion. The remainder of her responses indicate that she would consider mitigating and aggravating evidence in sentencing a defendant in a capital case. See 
People v. Hope
, 168 Ill. 2d 1, 31-32 (1995) (denial of defense challenge for cause was not an abuse of discretion when, in context, prospective juror indicated that her views about the death penalty would not impair the performance of her duties as a juror). Thus, no further explanation of her views was necessary, and it was not an abuse of discretion for the court to refuse to excuse her for cause.

3. Irene Keagle

Similarly, the circuit court did not err in refusing to excuse venireperson Keagle for cause or in refusing defendant’s request that the court question her further. When asked about her feelings on the death penalty, Keagle stated: “[I]f someone did commit murder, then they do deserve the death penalty if they’re guilty.” When asked if she would sentence a defendant to death in every capital case involving a guilty verdict for first degree murder, Keagle initially said “yes.” She later explained, however, that it was her view that whether the death penalty was warranted in such a case would depend on the circumstances. For example, she stated, “Well, like an adult, like it’s an adult where maybe it was someone protecting themselves, if something like that happened then I would think twice maybe about the death penalty, but an adult towards a child I feel the death penalty if the person is guilty would apply.” She also stated, however, that her attitude would not interfere with her ability to be impartial, to follow the court’s instructions, and to keep an open mind at each phase of the case.

We agree with the circuit court that, although somewhat equivocal, Keagle’s responses demonstrated that she would not impose the death penalty in every case. Her statement that she believed the death penalty would be appropriate in cases in which an adult murders a child was only an example of those circumstances under which she believed the death penalty was appropriate. Furthermore, she expressed her ability and willingness to decide the case according to the evidence presented and regardless of her personal views. Given these responses, it was unnecessary for the circuit court to further examine this prospective juror, and the circuit court properly denied defendant’s challenge for cause. See 
Hope
, 168 Ill. 2d at 31-32.

4. Jeanette Smeets

Defendant also asserts that it was error for the circuit court to refuse his request for follow-up questioning of Smeets and to deny his challenge to her for cause. When asked about her feelings about the death penalty, Smeets stated that she believed in “an eye for an eye.” She explained, however, that her attitude toward the death penalty would not prevent her from being impartial and that she would not impose the death penalty in every case because she would “have to hear the facts.” The circuit court denied defendant’s request for additional questioning on these views.

Pursuant to defendant’s request, the circuit court did, however, ask Smeets additional questions to determine whether, given what she had already learned concerning the case, she could presume defendant innocent. Smeets had stated that, based on what she had heard and read about the case, she believed defendant was probably guilty but that she could judge the case based on the facts presented in the courtroom. In addition, in one of her responses, Smeets expressed the opinion that it would be “nice” if defendant were required to prove his innocence but that she understood he was not required to do this.

We find no abuse of discretion with respect to the circuit court’s refusal to engage in any further reverse-
Witherspoon 
questioning of Smeets or its refusal to excuse Smeets for cause. We agree with the circuit court that Smeets’ 
voir dire 
responses adequately indicated that, although she generally believed the death penalty was appropriate in cases of murder, she would not impose it in every case. In addition, while Smeets indicated that she had formed an opinion as to defendant’s guilt based on information she received outside the courtroom, she stated that she could set this aside, presume defendant innocent, and make her decision based on the evidence presented in the courtroom. See 
People v. Coleman
, 168 Ill. 2d 509, 547 (1995) (a juror’s exposure to publicity about a case does not require disqualification so long as the juror can set aside opinions about the case and base her decision on the evidence presented). The circuit court found that Smeets’ views would not substantially impair her performance as a juror, and, given the record and the circuit court’s superior position to evaluate her responses (see 
People v. Hickey
, 178 Ill. 2d 256, 296 (1997)), we decline to overturn its determination.

5. John Roop

Defendant also asserts error with respect to the circuit court’s refusal to excuse venireperson Roop for cause. During 
voir dire
, Roop stated that he had “pretty strong” feelings in favor of the death penalty. He also stated, however, that his feelings were not such that he would vote to impose the death penalty in every case in which there was a conviction for first degree murder. In addition, he stated that, despite his personal views on capital punishment, he could be fair and impartial in deciding whether to impose the death penalty.

Roop also indicated that, based on what he had heard about the case, he believed defendant was “probably guilty,” and that this information had affected his ability to presume defendant innocent. Upon further questioning, however, Roop stated that he believed he could set aside what he had heard and presume defendant innocent. The circuit court had the opportunity to view Roop’s demeanor during 
voir dire 
and assess his credibility and the meaning of his responses. Based on the record, we find that the circuit court’s denial of the defense challenge for cause was not against the manifest weight of the evidence. See 
Coleman
, 168 Ill. 2d at 546-47.

6. Laura Morse

While defendant’s objections to the previous five jurors concerned their views on capital punishment, defendant challenged venireperson Morse for cause because she was married to a Will County deputy sheriff. According to defendant, the circuit court improperly refused to excuse Morse for cause because it permitted the State’s challenges to jurors with similar relationships. During 
voir dire
, Morse stated that her husband was a Will County deputy sheriff but that this would not prevent her from being a fair and impartial juror and that she had formed no opinions about defendant’s guilt. She also informed the circuit court that her husband had no involvement in defendant’s case and that she would not discuss the case with him.

These responses indicate that, despite her relationship to an employee of the sheriff’s department in the county where Christopher’s body was found, Morse could serve as a fair and impartial juror. We hold that the circuit court did not abuse its discretion in denying defendant’s challenge for cause to Morse. See 
People v. Buie
, 238 Ill. App. 3d 260, 277 (1992) (the circuit court properly denied the defendant’s challenge to a juror who stated that, although she was a good friend of a police officer in the department investigating the case and it would be difficult not to listen to his opinion, she could honor her oath as a juror); see also 
People v. Johnson
, 149 Ill. 2d 118, 136-38 (1992) (circuit court did not err by refusing to excuse a prospective juror whose brothers-in law were police officers).

Defendant argues, however, that it was unfair for the circuit court to refuse his challenge to Morse, yet excuse venirepersons Albert Powell and Sharon Michalak. During 
voir dire
, Albert Powell, a salesman at a clothing store, stated that he had known one of defendant’s attorneys for years because the attorney had been a customer of his. The State exercised one of its peremptory challenges to exclude Powell from the jury. Subsequently, the defense objected to the State’s peremptory challenge against Powell on the basis that it violated 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). The State responded that it had challenged Powell because of his relationship with defense counsel. The circuit court denied defendant’s 
Batson 
motion.

Michalak stated during jury selection that she worked as an associate principal at the school where defendant’s stepmother worked as a teacher and that this relationship would play a factor in her consideration of the evidence in the case. Based on these responses, the court granted the State’s motion to excuse Michalak for cause.

We disagree with defendant that the circuit court’s refusal to excuse Morse for cause was unfair in light of the court’s decisions to permit the State to excuse Powell and Michalak. As a preliminary matter, we believe it is improper for defendant to compare the circuit court’s ruling on a challenge for 
cause 
against Morse to its decision that the State’s use of a 
peremptory 
challenge against Powell did not violate 
Batson. 
The standards involved in these determinations are entirely different. In evaluating a challenge for cause by the State, the circuit court must determine whether the State has shown that a juror cannot be fair and impartial. See 
People v. Williams
, 173 Ill. 2d 48, 67 (1996). By contrast, in deciding a 
Batson 
motion, the circuit court determines only whether the basis for the State’s peremptory challenge is racially discriminatory. See 
People v. Williams
, 164 Ill. 2d 1, 19 (1994). Thus, the circuit court’s denial of defendant’s 
Batson 
motion does not demonstrate that its refusal to excuse Morse for cause was unfair.

Defendant’s comparison of the circuit court’s ruling on the defendant’s challenge to Morse with its ruling on the State’s challenge to Michalak also does not persuade us that the court erred by refusing defendant’s motion to exclude Morse for cause. Michalak worked closely with a family member of defendant and stated that this relationship would affect her consideration of the evidence in the case. By contrast, Morse’s husband had no involvement in the case, and Morse affirmatively stated that her husband’s employment would have no effect on her as a juror.

C. Conduct of Voir Dire

In addition to these arguments concerning voir dire, defendant claims that the overall manner in which the circuit court conducted 
voir dire 
resulted in the denial of his constitutional right to a fair and impartial jury. Defendant contends that (1) the circuit court’s questions were not sufficiently “open-ended,” (2) the court’s follow-up questions were inadequate, and (3) the court favored the State in granting requests for follow-up questions. As a result, he contends, the 
voir dire 
was inadequate.

We first address defendant’s objections to the type of 
voir dire 
questions asked by the circuit court. He argues that the court asked too many “yes” or “no” questions, the result of which was that the court failed to elicit sufficient information concerning the juror’s attitudes. In addition, he contends that the circuit court used leading follow-up questions to induce jurors to change their answers. According to defendant, jurors appeared to be “reading” the court for the “right” answer.

Defendant asserts that the court should have explored how jurors felt with more probing questions. Our review of the record, however, indicates that the circuit court’s questions were sufficient to elicit relevant information. Although it was possible to respond to most of the court’s questions by providing a “yes” or “no” answer, jurors often provided additional information. For example, venireperson Deborah Pevion’s responses during the following colloquy provided the information necessary for the defense to excuse her for cause:

“THE COURT: Now, would what you have read or heard require the defendant to prove himself innocent?

JUROR PEVION: Well, I can’t understand–well, it’s the law, I understand that, but to me I feel like that a person should present himself in any way–

THE COURT: And so do you feel that a defendant then should be required to prove himself innocent of the charge against him?

JUROR PEVION: Well, not so much to prove himself but to speak.

THE COURT: Okay. Would you hold it against any defendant the fact that he didn’t or she didn’t testify in a trial when they were charged with the crime?

JUROR PEVION: It would make me question.”

Also, each prospective juror not excused during preliminary questioning was required to provide a narrative answer to the court’s question, “Can you explain to us here in court what your feelings are about the imposition of the death penalty?” Their responses generally gave a clear picture of their attitudes toward this law. For example, venireperson Karl Strenge stated that, “As a Christian, I think I would have an extremely difficult time judging in favor of the death penalty.” In addition, in response to follow-up questions by the circuit court, Strenge stated, “I would say [my feelings against the death penalty are] probably ninety percent strong. I can [
sic
] say that I have a hundred percent understanding or consideration of the issue; but for strong religious moral reasons, I am quite assured of that, that I would oppose.” Based on the fact that Strenge indicated that he could follow the law despite these beliefs, the circuit court denied the State’s motion to excuse him for cause.

 Similarly, in response to the circuit court’s questioning about her feelings on the death penalty venireperson Laura Gunn stated: “I believe an eye for an eye. I’m sorry but that’s the way I believe in it. I believe in the death penalty. I’m for the death penalty. I look at it, that person had rights too. I’m sorry, that’s how I feel.” The court then asked Gunn, “Are there circumstances under which then that you feel the death penalty wouldn’t apply in the case of a murder?” She replied, “Well in the case of murder if I felt the person was guilty, then I would say yes for the death penalty.” Based on these responses, the circuit court granted defendant’s motion to excuse her for cause.

As these examples illustrate, the circuit court’s questioning did not prevent defendant from obtaining the necessary information concerning jurors’ attitudes toward the law. Nor do we agree with defendant that the record demonstrates that the circuit court improperly “led” prospective jurors to a certain answer.

As evidence of “leading” questioning, defendant cites the circuit court’s examination of venireperson Joseph Terlep. In relevant part, that examination was as follows:

“THE COURT: Now Mr. Terlep, can you tell us what your feelings, what personal feelings you have, if any, regarding the imposition of the death penalty?

JUROR TERLEP: Well, I like to hear the whole story. I don’t know nothing about it. Death penalty. I like to know what the truth is and how I take it as being.

THE COURT: So you don’t–as you sit there now, you don’t seem to have any strong feelings for or against the death penalty?

JUROR TERLEP: No, that’s right.

* * *

THE COURT: *** Are your beliefs such that you feel in every case if a defendant is found guilty of first degree murder he should be sentenced to death, are those your feelings?

JUROR TERLEP: Yes.

* * *

THE COURT: And are your feelings about the death penalty such that you would always vote to impose the death penalty in every murder case where there has been a finding of guilty?

JUROR TERLEP: No, not necessarily, no.

THE COURT: Now I think before you indicated that you did feel that way. Were you confused then?

JUROR TERLEP: Somewhat.

THE COURT: Do you think that the death penalty should apply to every case where a defendant has been convicted of first degree murder?

JUROR TERLEP: Yes.

THE COURT: That’s your feeling?

JUROR TERLEP: That’s my feeling, yes.

THE COURT: But are those feelings such that you would always vote to impose it in every case and not follow the law?

JUROR TERLEP: Oh, that’s no.”

According to defendant, Terlep indicated that he would automatically vote to impose the death penalty in every first degree murder case “until he realized that he was supposed to say the opposite to satisfy the court.” Defendant concludes that “[t]he trial court here plowed through the same 23 or so questions with every prospective juror, apparently having as its chief priority qualifying the venire above all else, at the risk of sacrificing the greater goal of uncovering biases and fostering the intelligent exercise of challenges based thereon.” We disagree.

Our review of the record convinces us that the questioning defendant describes as “leading” was merely an appropriate and necessary attempt by the circuit court to clarify the views of prospective jurors. Given Terlep’s statement that he did not have strong feelings for or against the death penalty and that he would have to hear the “whole story” before determining whether the death penalty was appropriate in a particular case, it was reasonable for the court to ask additional questions to determine whether Terlep really intended to answer the court’s reverse-
Witherspoon 
questions in the affirmative. Furthermore, during his examination by the court, Terlep appeared to be confused due to the length of the court’s questions and due to his failure to pay attention to these questions. Indeed, the court asked Terlep at least once whether he understood the court’s question and also commented, “I don’t know if you were listening to me here, so I’m going to ask you this question again.” Under these circumstances, we do not believe it was an abuse of discretion for the circuit court to verify the correctness of Terlep’s responses to its reverse-
Witherspoon 
questions. With respect to other prospective jurors whose examination defendant also claims was improperly “leading,” we also find no error for similar reasons.

Next, we address defendant’s argument that the 
voir dire 
conducted by the circuit court was inadequate because the circuit court did not ask sufficient follow-up questions of prospective jurors. Defendant asserts that the circuit court should have asked prospective jurors to elaborate on their responses to reverse-
Witherspoon
 questions. Specifically, he claims that the circuit court erred in refusing defense requests for follow-up questions concerning (1) under what circumstances would jurors automatically impose the death penalty for first degree murder and (2) whether a juror would consider mitigation evidence.

The arguments defendant makes with respect to the circuit court’s refusal to ask these follow-up questions, however, are essentially the same arguments he makes with respect to the court’s refusal to include those questions in its general 
voir dire. 
For the same reasons we rejected defendant’s contention that it was error for the circuit court to refuse to include these questions in its 
voir dire 
inquiry, we reject defendant’s argument that the circuit court should have asked these same questions as a follow-up to the questions the court did ask.

Defendant argues also that the circuit court conducted 
voir dire 
in an unfair manner because it granted the State’s requests for follow-up questioning, while denying similar requests by the defense. As evidence of this practice, defendant compares the court’s 
voir dire 
of venirepersons George Boles, Sr., to that of Laura Gunn, Todd Coleman, Sharon Michalak, and Keith Douglas. After reviewing the court’s examination of these jurors, we find defendant’s claim of favoritism to be completely without merit.

During 
voir dire
, Boles stated, “I don’t believe in the death penalty. I don’t think I could–I couldn’t vote for the death of anyone.” In response to further questioning by the circuit court, Boles indicated that his feelings were based on his conscience, he could not consider signing a verdict to sentence a defendant to death in any circumstances, and his views would prevent him from being impartial with respect to whether to impose the death penalty. Because of these definitive responses, the circuit court denied defendant’s request for follow-up questions to determine whether Boles could set his views aside and granted the State’s motion to excuse Boles for cause.

 A prospective juror who unequivocally states that he or she could not follow the law and could not impose the death penalty under any circumstances may be excused for cause. See
 People v. Hickey
, 178 Ill. 2d 256, 296 (1997). Here, although Boles was not specifically asked whether he could set aside his views and follow the law, he clearly indicated that he could not be impartial and would not impose the death penalty under any circumstances. Given these statements, the circuit court was not required to question him further and properly granted the State’s motion for cause. See 
People v. Brown
, 172 Ill. 2d 1, 33 (1996) (additional inquiry not required when prospective juror’s responses unambiguously indicated that she would never vote for the death penalty under any circumstance).

Defendant asserts, however, that the denial of his request for follow-up questioning of Boles was unfair in light of the circuit court’s decision to grant the State’s requests for follow-up questioning of venirepersons Gunn, Coleman, Michalak, and Douglas. Our review of the record, however, demonstrates that defendant’s comparisons are ill-chosen. First, the State made no request for follow-up questioning of venirepersons Gunn and Coleman. The circuit court’s examination of these two jurors, therefore, does not support defendant’s claim that the circuit court unfairly denied defense requests for follow-up questions while granting State requests for the same.

Second, although the circuit court did grant the State’s request for follow-up questioning of Michalak, these questions involved the unique circumstance of this venireperson’s employment relationship with defendant’s stepmother. The circuit court’s decision to ask additional questions of Michalak is not, therefore, comparable to the court’s decision not to conduct a further inquiry of Boles.

Finally, with respect to venireperson Douglas, defendant agreed with the State that he should be questioned further regarding the effect of his employment on his jury service. Thus, the circuit court’s decision to grant the State’s request for such questioning does not demonstrate bias against the defense.

As support for his argument that the manner in which the court conducted 
voir dire 
denied him an impartial jury, defendant relies heavily on the Supreme Court of New Jersey decision in 
State v. Williams
, 113 N.J. 393, 550 A.2d 1172 (1988). Contrary to defendant’s assertions, this decision does not require that we grant defendant a new trial and capital sentencing hearing based on deficiencies in the 
voir dire.

Williams 
was decided by a court in another state, and, therefore, we are not obligated to follow its holding. See 
Gorham v. Board of Trustees of the Teachers’ Retirement System
, 27 Ill. 2d 593, 599 (1963). Indeed, we note that this New Jersey decision is inconsistent with the precedent of this state. The 
Williams 
court held that it was error for the trial court in that case to refuse to ask jurors whether they would automatically impose the death penalty for a murder conviction, if particular aggravating factors existed. By contrast, this court has held in several cases that the circuit court is not required to ask prospective jurors such questions. See 
Jackson
, 182 Ill. 2d at 59-60; 
Brown
, 172 Ill. 2d at 30-31; 
Hope
, 168 Ill. 2d at 29-30.

We find that 
Williams 
has limited value as persuasive authority, not only because it conflicts with these Illinois decisions, but also because of the fact-specific nature of the 
Williams 
holding. For example, the 
Williams 
court criticized the 
voir dire 
conducted by the trial court in that case on several bases, including (1) the court’s failure to adequately use open-ended questions and (2) the court’s use of leading questions to suggest “correct” answers to jurors. See 
Williams
, 113 N.J. at 408-45, 550 A.2d at 1179-1200. With respect to one juror, the 
Williams 
court found that the trial court’s questioning was so inadequate that “[n]othing of substance concerning the juror’s death penalty views is ascertainable from [the] record.” 
Williams
, 113 N.J. at 423, 550 A.2d at 1187.

By contrast, as we have explained, the record in defendant’s case indicates that the 
voir dire 
conducted by the circuit court was sufficient to discover which venirepersons were “so closed by bias and prejudice that they [could not] apply the law as instructed in accordance with their oath.” See 
Hope
, 168 Ill. 2d at 30. Based on these factual distinctions and the differences between Illinois and New Jersey law, we disagree with defendant that 
Williams 
supports a holding that 
voir dire 
was inadequate in this case.

After reviewing defendant’s contentions concerning 
voir dire 
and the record, we find no abuse of discretion by the circuit court with respect to jury selection and no denial of defendant’s constitutional right to an impartial jury. Accordingly, we refuse to order a new trial or capital sentencing hearing on this basis.

II. Pretrial and Trial Issues

In addition to his assertions of error with respect to jury selection, defendant contends that the following pretrial and trial errors require that he receive a new trial: (1) the circuit court erred in denying his motion to quash arrest and suppress evidence; (2) the evidence was insufficient to support his convictions for felony murder, aggravated kidnaping, and aggravated unlawful restraint; (3) his counsel was ineffective for failing to object to certain testimony by one of the State’s witnesses; (4) the fact that defendant wore leg shackles denied him a fair trial; and (5) the admission of evidence concerning the identity of the body found at Hunting Area 7, as well as evidence of the time and cause of Christopher’s death, denied him a fair trial.

A. Motion to Quash Arrest and Suppress Evidence

Prior to trial, defendant filed a motion to quash his arrest and suppress evidence resulting from that arrest. After a hearing, the circuit court denied defendant’s motion. The circuit court found that defendant was not arrested until 12:30 p.m. on August 10, 1995, when police told defendant’s attorney that defendant was not free to leave the sheriff’s department, and the police had probable cause to arrest defendant at this time. Further, the court found that, even assuming his arrest was illegal, the consent defendant gave for the search of his car was valid because his opportunity to consult with an attorney prior to giving this consent was an intervening cause sufficient to prevent the consent from being tainted by any illegal arrest.

Defendant now argues that the circuit court’s denial of his motion to quash arrest and suppress evidence is reversible error. According to defendant, police did not have probable cause to arrest him on August 10 until they searched his car following his consent to that search at 1:30 p.m. that day. He asserts, therefore, that he was illegally arrested when police told his attorney at 12:30 p.m. that he was not free to leave the sheriff’s department. Alternatively, defendant contends that he was arrested when police confronted him at the Wilmington Dam and that this arrest was without probable cause.

In addition, defendant argues that certain evidence obtained following his arrest should be suppressed because it resulted from the illegal arrest. Although he consented to the search of his car, he contends that this consent was a product of the illegal arrest and, therefore, involuntary. Thus, he asserts that evidence recovered during the search of his car should have been suppressed. He also claims that Chuck Henry’s identifications of him in court and at an August 11 lineup must be suppressed because they also resulted from his illegal arrest.

The State responds that defendant was not arrested until 12:30 p.m., at which time there was probable cause for his arrest. According to the State, defendant’s consent to the search of his car was, therefore, valid, and Henry’s identifications were properly admitted.

Both the United States Constitution and the Illinois Constitution protect individuals from unreasonable searches and seizures. 
People v. Williams
, 164 Ill. 2d 1, 11 (1994); U.S. Const., amends. IV, XIV; Ill. Const. 1970, art. I, §6. In order for a warrantless arrest to be lawful under these constitutional provisions, police must have “ ‘ “knowledge of facts which would lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant.” ’ ” 
People v. Jones
, 156 Ill. 2d 225, 237 (1993), quoting 
People v. Wright
, 111 Ill. 2d 128, 145 (1985), quoting 
People v. Eddmonds
, 101 Ill. 2d 44, 60 (1984); 
People v. Kidd
, 175 Ill. 2d 1, 22 (1996). “ ‘ “In dealing with probable cause, *** we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.” [Citations.]’ ” 
Kidd
, 175 Ill. 2d at 24, quoting 
People v. Wright
, 111 Ill. 2d 128, 146 (1985). In determining whether police had probable cause to make an arrest, courts examine facts known to police at the time the arrest was made. 
People v. Robinson
, 167 Ill. 2d 397, 405 (1995). “When officers are working in concert, probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest.” 
People v. Bascom
, 286 Ill. App. 3d 124, 127 (1997).

A defendant has the burden of demonstrating an illegal search or seizure. 
Kidd
, 175 Ill. 2d at 22. In reviewing a ruling on a motion to suppress, a reviewing court may consider evidence presented at trial as well as evidence presented at the suppression hearing. 
People v. Sims
, 167 Ill. 2d 483, 500 (1995). When the circuit court’s ruling on such a motion involves factual determinations and credibility assessments, it will be reversed on appeal only when manifestly erroneous. 
People v. Wright
, 183 Ill. 2d 16, 21 (1998). 
De novo 
review is appropriate, however, when there are no factual or credibility disputes. 
Wright
, 183 Ill. 2d at 21; see also
 People v. Williams
, 181 Ill. 2d 297, 309 (1998). In this case, there were no such disputes at the hearing on the motion to quash arrest and suppress evidence, and we, therefore, apply a 
de novo 
standard of review to the circuit court’s ruling.

We begin by addressing the legality of defendant’s arrest. The circuit court found that defendant was not arrested until 12:30 p.m. on August 10, at which time the police had probable cause to arrest him. We may affirm the circuit court’s ruling on defendant’s motion to suppress for any reason in the record, regardless of whether the circuit court expressed this reason as a basis for its conclusion. 
Sims
, 167 Ill. 2d at 500-01. While we agree that the police had probable cause to arrest defendant, we find that probable cause existed before 12:30 p.m. on August 10. Our review of the record convinces us that police had probable cause to arrest defendant when they met with him at the Wilmington Dam at approximately 9 a.m. on August 10. Consequently, even if, as defendant argues, he was arrested at the dam, the circuit court properly refused to quash his arrest.

First, the record supports a conclusion that when police spoke to defendant at the Wilmington Dam, they had probable cause to believe a crime had been committed. Defendant contends that probable cause was lacking because, on August 10, Christopher’s body had not yet been found, and police had not eliminated the possibility that Christopher had drowned. When there is a question as to whether a crime has been committed, in addition to whether the defendant committed the crime, more evidence is required to demonstrate probable cause. 
In re D.G.
, 144 Ill. 2d 404, 410 (1991). However, although police must have more than a mere suspicion to establish probable cause, “probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause is present.” 
People v. House
, 141 Ill. 2d 323, 370 (1990)
.

In this case, a reasonable person would have believed that a crime had been committed at the time police approached defendant at the Wilmington Dam. Christopher, who was only 10 years old, had been missing for almost three days. He was last seen riding home from the boat launch on his bicycle. The bicycle he was riding was found in a wooded area across the river from the boat launch on August 8 and his shoes were found floating in the river on August 8 and 9. Charles Henry had told police that, on August 7, he had seen a man with a knife standing by the open trunk of his car in the area where Christopher’s bicycle was found. Although, on August 10, police did not know Christopher had been murdered, it was reasonable to conclude that his disappearance was caused by criminal means.

We also have no difficulty finding that, when they approached defendant at the dam, police had probable cause to believe that defendant was the one responsible for Christopher’s disappearance. Defendant argues that police had no “concrete evidence linking” defendant to Christopher’s disappearance. This is not the probable cause standard, however. Police needed only reasonable grounds to believe that defendant committed a crime. 
Sims
, 167 Ill. 2d at 500; see also 725 ILCS 5/107–2(c) (West 1994). Among the factors relevant to establishing probable cause are (1) the proximity of the defendant’s residence to the scene of the crime (
People v. Hendricks
, 253 Ill. App. 3d 79, 88-89 (1993))
; 
(2) the fact that the defendant committed a similar crime in the past (
Hendricks
, 253 Ill. App. 3d at 88-89)
; 
(3) whether defendant was among the last to see the victim alive (
People v. Myrick
, 274 Ill. App. 3d 983, 990 (1995)); and (4) flight from police (
People v. Wright
, 286 Ill. App. 3d 456, 459-60 (1996)).

Before approaching defendant at the Wilmington Dam, police had information that defendant fit the description of the last person seen with Christopher before his death. Three individuals, Beth Waselewski, Jason Forbes, and Paul Buckner, told police that they had seen Christopher at the boat launch that afternoon in the company of a man and gave police a description of this man and his car. In addition, Buckner told police that he had talked about fishing with the man, and the man had said that he had only salt water bait, that he had grown up in the Aroma Park area, and that he had recently returned from Florida. Police also had spoken to Charles Henry, who said that, during the afternoon of August 7, he had seen a man with a filet knife in his back pocket standing by the open trunk of his car in the area where Christopher’s bicycle was found. Henry also gave police a description of the man and his car.

As of 9 a.m. on August 10, police had reason to believe defendant was the man described by these witnesses. Police knew that defendant had previously been convicted of a murdering another missing child. In 1981, when defendant was 13 years old, he murdered five-year-old Tara Sue Huffman, whose body was found several hours after she was reported missing. He was in prison for this murder until approximately two years prior to Christopher’s disappearance.

Police were also aware that defendant was originally from the Aroma Park area, that he had recently moved from Florida to Joliet, and that his father lived a mile from the boat launch. Police had learned that defendant drove a car similar to that described by the witnesses with whom they had spoken. In addition, pictures of defendant that police had obtained from the Illinois Department of Corrections and information from defendant’s parole officer indicated that defendant matched the description police had of the man seen at the boat launch and on Birchwood Drive on August 7.

Further, while police were conducting surveillance of defendant’s apartment around 9 p.m. on August 9, defendant eluded them by driving away from his apartment building at a high rate of speed through an alley without his headlights. Police learned that, later that evening, defendant checked into the B and P Motel near the Wilmington Dam using the name of Jim Benson. In the morning, police observed defendant as he checked out of the motel, placed a pair of boots in the motel dumpster, and drove to the Wilmington Dam. When officers approached defendant at the dam, he appeared nervous, did not make eye contact, walked in circles, and shielded his face to avoid having his picture taken. Based on the knowledge police had of these facts at 9 a.m. on August 10, we find that they had probable cause to arrest defendant at the Wilmington Dam.

Defendant asserts, however, that certain discrepancies in the descriptions provided to police demonstrate that police had no probable cause to arrest him. For example, Waselewski said the man she saw at the boat launch was in his mid- to late thirties, while defendant was in his late twenties. In addition, Henry did not include a mustache in his description of the man he saw and described this man as “dark-complected.” Notwithstanding these inconsistencies, we believe the descriptions provided by these witnesses, when viewed as a whole, supported a finding of probable cause. In general, the physical characteristics described by Henry and Waselewski were consistent with those described by other witnesses and matched defendant’s physical appearance. Also, although Waselewski did not describe defendant’s age accurately, Buckner did. Moreover, defendant was linked to the man at the boat launch and the man Henry saw, not just by physical appearance, but also by the appearance of the car he drove and what he told Buckner about himself. Based on these facts, we will not overturn the circuit court’s determination that police had probable cause to arrest defendant for Christopher’s disappearance. See, 
e.g.
, 
People v. Starks
, 190 Ill. App. 3d 503, 508 (1989) (a general description of a suspect plus proximity of time and place can constitute sufficient cause to stop or arrest).

We also reject defendant’s suggestion that the State did not establish probable cause to arrest him because Sims and Mitchell testified that they believed they did not have sufficient evidence to arrest defendant at the Wilmington Dam. Probable cause is an objective standard, and an officer’s subjective belief as to the existence of probable cause is not determinative. 
People v. Moody
, 94 Ill. 2d 1, 9 (1983). As we have explained, the facts demonstrate that police had probable cause to arrest defendant at the Wilmington Dam, and their subjective beliefs to the contrary do not alter that conclusion.

Having determined that the circuit court properly refused to quash defendant’s arrest, we now address defendant’s arguments that the circuit court erred in denying his request to suppress certain evidence. Defendant contends that the circuit court should have suppressed Henry’s identifications of him in-court and at a lineup on August 11 because these identifications resulted from his illegal arrest. In addition, defendant argues that evidence recovered from his car was improperly admitted because, his consent notwithstanding, the search of his car on August 10 was also the product of his illegal arrest. Given our holding that defendant’s arrest was lawful, we reject these contentions.

Defendant also argues, however, that the search of his car was illegal because he suffered from a language-based learning disability which caused his consent to the search to be involuntary. Defendant did not, however, raise this issue at the hearing on the motion to suppress. Nor did he include it in his post-trial motion. In making this argument now, he relies on the sentencing testimony of a defense expert concerning this learning disability. Because defendant failed to raise this issue at trial, we find it waived. See 
People v. McClellan
, 232 Ill. App. 3d 990, 1004 (1992) (finding that a defendant waived review of his argument that his statements were coerced by failing to raise it in his motion to suppress); 
People v. Robinson
, 167 Ill. 2d 397, 404 (1995) (a defendant waives an issue for purposes of appeal when he fails to raise it through both an objection and a post-trial motion).

B. Sufficiency of the Evidence

We now turn to defendant’s arguments that errors at trial require that we reverse his convictions. In his separate 
pro se 
brief, defendant contends that there was insufficient evidence to support his convictions for felony murder, aggravated kidnaping, and aggravated unlawful restraint. In a related argument, he asserts that the circuit court erred in denying his motion for a directed verdict. As a preliminary matter, we observe that defendant was not convicted of the charge of felony murder. The only first degree murder charge on which the circuit court entered judgment involved intentional, not felony, murder. With respect to his aggravated kidnaping and aggravated unlawful restraint convictions, we find that his challenges to the sufficiency of the evidence and the circuit court’s ruling on his directed verdict motion are without merit.

As defendant argues, secret confinement is an essential element of the aggravated kidnaping offense with which he was charged. See 720 ILCS 5/10–2(a) (West 1994). Aggravated unlawful restraint occurs when a person “knowingly without legal authority detains another while using a deadly weapon.” 720 ILCS 5/10–3.1 (West 1994).

Defendant asserts that the State failed to establish the essential elements of aggravated kidnaping and aggravated unlawful restraint because the evidence was insufficient to show either secret confinement or detention of Christopher. He argues that no one saw Christopher secretly confined by him, the physical evidence was insufficient to prove secret confinement, and, although Christopher’s blood and hair were found in his car, the State failed to show that Christopher was alive at the time his body was transported in the car. According to defendant, the circuit court should have, therefore, granted his motion for a directed verdict and his convictions must be reversed. We disagree.

Circumstantial evidence is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged. 
People v. Williams
, 182 Ill. 2d 171, 192 (1998). In reviewing a challenge to the sufficiency of the evidence, a reviewing court asks whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
People v. McLaurin
, 184 Ill. 2d 58 (1998). Similarly, a motion for a directed verdict may be granted only if, as a matter of law, the evidence is insufficient to support a guilty verdict. 
People v. Robinson
, 199 Ill. App. 3d 24, 37-38 (1989).

According to testimony at trial, Christopher was last seen leaving the boat launch at approximately the same time as defendant and was traveling in the same direction as defendant. Christopher was supposed to be riding home from the boat launch, but he never made it home. His body was found a week later in a shallow grave in another county. His bicycle was found in a wooded area across the river from the boat launch. Two hairs matching Christopher’s were found in the front seat of defendant’s car, and Christopher’s blood was found in defendant’s trunk.

Based on this evidence, it was reasonable for the jury to conclude that defendant secretly confined Christopher by driving him to a secluded location, killing him at that location, and then transporting Christopher’s body to Hunting Area 7 in the trunk of his car. In addition, the evidence that Christopher was killed with a knife like the one owned by defendant supports a finding that defendant detained Christopher, if only for a short time prior to his death, by the use of a deadly weapon. Accordingly, we reject defendant’s challenge to his convictions for aggravated kidnaping and aggravated unlawful restraint and uphold the circuit court’s denial of his motion for a directed verdict.

C. Ineffective Assistance of Counsel

Defendant also argues, 
pro se
, that his trial counsel was ineffective for failing to object to Gail Kienast’s trial testimony that there was blood found on the boots he placed in the dumpster of the B and P Motel. Because Kienast was unable to identify this blood as human blood or ascertain the blood type, defendant asserts that his trial counsel should have objected to her testimony on the basis of relevancy.

To establish ineffective assistance of counsel, a defendant must demonstrate both that counsel’s performance was deficient and that he was prejudiced by counsel’s error. 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Counsel’s performance is presumed to be the product of sound trial strategy and not of incompetence (
People v. Coleman
, 183 Ill. 2d 366, 397 (1998)), and no 
Strickland 
violation will be found unless counsel’s professional errors are so serious that “ ‘counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment’ ” (
People v. Erickson
, 183 Ill. 2d 213, 223-24 (1998), quoting 
Strickland
, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064). To satisfy the prejudice 
prong 
of the 
Strickland 
test, a defendant must demonstrate that, but for defense counsel’s deficient performance, the result of the proceeding would have been different. 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. If a reviewing court finds that the defendant did not suffer prejudice, it need not decide whether counsel’s performance was constitutionally deficient. 
People v. Bull
, 185 Ill. 2d 179, 203 (1998).

We hold that defendant has failed to satisfy either prong of the 
Strickland 
test. Defendant has not overcome the presumption that his counsel’s performance was the product of sound trial strategy. Defense counsel could have reasonably concluded that Kienast’s testimony about the blood on the boots was helpful to the defense. While the State argued at trial that Kienast’s inability to identify the type of blood on the boots was consistent with its theory that defendant had washed them, the fact that she could not identify the blood as human also helped the defense to rebut the State’s argument that the boots were involved in the murder. If defendant had worn the boots when he killed Christopher or disposed of his body, one would expect to find human blood on the boots, yet Kienast was unable to identify the blood. In addition, during closing argument, the defense reminded the jury that defendant was a fisherman and suggested that the source of the blood was the fish he caught. Defense counsel may have, therefore, chosen not to object to Kienast’s testimony because it permitted the defense to suggest an innocent use for the boots and undermined the State’s argument that the boots were involved in the murder. Thus, defendant has established neither deficient performance nor prejudice.

D. Shackling

In addition to the preceding alleged trial errors, defendant asserts that the fact he wore leg shackles during 
voir dire 
and trial requires that his convictions be reversed. Prior to trial, defendant filed a motion requesting that he not be required to wear leg shackles during jury selection and trial. In presenting this motion, defense counsel began by stating that he understood it was “past practice” to keep a defendant’s legs shackled, to bring him into the courtroom before the jury, and to seat him behind a specially constructed table so that the jury would not become aware of the shackles. Defense counsel further stated, “If that’s all acceptable to the State and to the Court, I guess I would have no objection if we proceeded that way.” The circuit court responded that this would be acceptable and that it would require the shackles.

Subsequently, during 
voir dire
, defendant objected because the shackles prevented him from being present at certain conversations between the circuit court and the attorneys. When it became necessary to consult with the attorneys outside the presence of a prospective juror, the circuit court held conversations with the attorney in the hallway outside the courtroom. Because of the shackles, defendant could not leave the courtroom. Based on his objection to this procedure, the circuit court agreed that, from that point on, prospective jurors would be excused from the courtroom when necessary so that defendant could be present for any conversations between the court and attorneys. Defense counsel stated that it was not necessary to repeat the questioning of jurors that had already occurred. He said only that “at this point from now on” defendant wanted to be present at conversations outside the presence of prospective jurors.

Prior to trial, the issue of the effect of the shackles on defendant’s presence at sidebars during trial arose. After consulting with defendant, defense counsel stated, “[J]ust for the record, it is not our intention or Mr. Buss’s intention to approach the bench during the course of the trial if there were sidebars.”

The State argues that defendant agreed to the shackling procedures used at trial and cannot now complain about those procedures. In addition, the State asserts that the shackling did not deny defendant a fair trial. Defendant responds that he preserved the shackling issue by filing a pretrial motion to preclude shackling and by including the issue in his post-trial motion. Alternatively, he argues that we may review the shackling issue under the doctrine of plain error or that his counsel was ineffective for failing to properly preserve the issue for review.

We choose to review the shackling issue on its merits (see 
People v. Kliner
, 185 Ill. 2d 81, 126-27 (1998)) and conclude that no error occurred as a result of defendant’s wearing shackles during the proceedings in this case.

In 
People v. Boose
, 66 Ill. 2d 261 (1977), this court reversed a defendant’s conviction on the basis that he was shackled at the hearing to determine his competency to stand trial. This court stated in 
Boose 
that shackling is generally disfavored because “(1) it tends to prejudice the jury against the accused; (2) it restricts his ability to assist his counsel during trial; and (3) it offends the dignity of the judicial process.” 
Boose
, 66 Ill. 2d at 265. Nevertheless, the court explained, a defendant may be shackled if there is an indication that he may try to escape, pose a threat to the safety of courtroom occupants, or disrupt the order in the courtroom. The 
Boose 
court listed a number of factors a circuit court should consider in determining whether to shackle a defendant, including:

“ ‘[T]he seriousness of the present charge against the defendant; defendant’s temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies.’ ” 
Boose
, 66 Ill. 2d at 266-67, quoting
 State v. Tolley
, 290 N.C. 349, 368, 226 S.E.2d 353, 368 (1976).

Whether a defendant should be shackled is a determination within the discretion of the circuit court. However, this court stated that the circuit court should place its reasons for shackling a defendant on the record and should provide defense counsel with an opportunity to offer reasons why the defendant should not be shackled. 
Boose
, 66 Ill. 2d at 266.

In 
Boose
, the only reason the circuit court gave for shackling the defendant was the nature of his crime (murdering a guard while an inmate at a juvenile detention center). Based on the record, this court found this reason alone insufficient to justify shackling the defendant and reversed the defendant’s conviction. 
Boose
, 66 Ill. 2d at 267-69.

Similarly, in 
In re Staley
, 67 Ill. 2d 33, 35-36 (1977), this court held that “ ‘poor security’ in the courtroom” was, by itself, an inadequate basis for shackling a defendant. Although there was no jury in that case, this court reversed the defendant’s conviction. This court explained that, even absent prejudice to a defendant before a jury, shackling may deny a defendant a fair trial by negatively impacting on his dignity and hindering his ability to consult with counsel. 
Staley
, 67 Ill. 2d at 37; see also 
People v. Bennett
, 281 Ill. App. 3d 814, 825 (1996) (plain error to shackle defendant based on courtroom security alone).

On the other hand, Illinois courts have found no abuse of discretion in shackling a defendant when the circuit court has expressed more than a single reason for shackling a defendant. See, 
e.g
., 
People v. Starks
, 287 Ill. App. 3d 1035, 1037 (1997) (defendant’s charge was serious, he was a flight risk, a prior conviction indicated violence, there was a potential for revenge from the victim’s family, and the courthouse presented serious security problems); 
People v. Henderson
, 223 Ill. App. 3d 131, 133 (1991) (based on the fact that defendant was serving a sentence for murder and had 248 prison disciplinary violations, the circuit court determined that defendant was an escape and safety risk); 
People v. McCue
, 175 Ill. App. 3d 762, 766-67 (1988) (defendants were properly shackled at their trial for a prison escape where, 
inter alia
, they were strong enough to escape, had a record of escape, and the circuit court was familiar with nature of security in courtroom).

In the case at bar, the circuit court did not state its reasons for requiring shackling at the time it initially denied defendant’s motion, presumably because defense counsel indicated that defendant did not object to leg shackles so long as the jury did not see them. In ruling on defendant’s post-trial motion on this issue, however, the circuit court explained that the basis for its denial of the motion was (1) courtroom security; (2) the extremely serious nature of the offense with which defendant was charged; and (3) the large audience in the courtroom. In addition, the circuit court observed that the tables in the courtroom had been skirted so that the shackling of the defendant was “never obvious to the jurors” and that defendant’s ability to consult with counsel had not been hindered by the shackling.

Based on this record, we find no abuse of discretion in the circuit court’s requirement that defendant wear leg shackles during trial. Two of the three reasons shackling is disfavored are not issues in this case: there is no evidence that the jury was aware of the shackles or that defendant’s ability to consult with counsel was affected. Although the dignity of the judicial process is always a concern, the circuit court provided reasons for shackling which this court has held may outweigh this concern. See 
Boose
, 66 Ill. 2d at 266-67. Moreover, defense counsel was given an opportunity to present reasons why defendant should not be shackled.
 
We, therefore, find that defendant was not denied a fair trial by the circuit court’s requirement that he wear leg shackles. Based on our conclusion that there was no error resulting from the shackling of defendant, we need not address his arguments concerning plain error and ineffective assistance of counsel.

 

E. Identity, Time, and Cause Evidence

As another basis for claiming that he was denied a fair trial, defendant challenges the admission of Blum’s, Pavlik’s, and Haskell’s testimony concerning the identity of the body found in Hunting Area 7, the time of Christopher’s death, and the cause of his death. Before trial, defendant offered to stipulate to the identity of the body, as well as to the time and cause of Christopher’s death. He also made a motion 
in limine
, in which he argued that, based on his offer to stipulate to these issues, the State should be precluded from presenting evidence related to them. The State did not agree to the stipulation, and the circuit court denied the motion 
in limine.

When a defendant pleads not guilty to an offense, the State is entitled to prove every element of that offense, even if a defendant does not dispute the relevant facts or offers to stipulate to them. 
People v. Bounds
, 171 Ill. 2d 1, 46 (1995). Defendant states in his brief that he does not take issue with this rule. Instead, he argues that Pavlik’s, Blum’s, and Haskell’s testimony should have been excluded because it was unduly prejudicial. According to defendant, the circuit court erred by failing to weigh the probative value of this evidence against its prejudicial effect. Defendant urges this court to require circuit courts to consider the availability of alternative evidence, such as the stipulation he offered, as part of the weighing process.

Despite his assertion to the contrary, defendant does indeed appear to be challenging the rule that a defendant cannot prevent the State from proving relevant facts by offering to stipulate to those facts. Nevertheless, defendant is correct that, in determining whether to admit evidence, a circuit court must weigh its probative value against its potential prejudicial effect. 
People v. Williams
, 181 Ill. 2d 297, 314 (1998). The circuit court is not required to exclude relevant evidence, however, just because it may be prejudicial to the defendant or might “arouse feelings of horror or indignation in the jury.” 
Williams
, 181 Ill. 2d at 314. It is the function of the circuit court to determine the admissibility of evidence, and its rulings will not be reversed absent an abuse of discretion. 
People v. Reid
, 179 Ill. 2d 297, 313 (1997).

We hold that the circuit court did not abuse its discretion in permitting Blum, Pavlik, and Haskell to testify concerning identity and the time and cause of Christopher’s death. First, we disagree with defendant’s assertion that the circuit court failed to weigh the probative value of this evidence against its prejudicial effect. In ruling on defendant’s motion 
in limine
, the circuit court expressly stated that the relevant standard was whether the prejudicial effect of particular evidence exceeded its probative value. It concluded that the testimony of these experts was not intended merely to inflame the passions of the jury. Instead, this testimony was probative of facts the State was entitled to prove, such as the time of death, cause of death, identity, nature of the injuries, and the type of weapon used. As the circuit court’s statements indicate, the court did perform the necessary balancing of probative value against prejudicial effect.

We also reject defendant’s argument that the circuit court erred by failing to consider the availability of alternative evidence (
i.e.
, defendant’s offer to stipulate) when it weighed probative value against prejudicial effect. The availability of alternative evidence will normally factor into this weighing process because the probative value of the evidence in dispute will necessarily be diminished if other evidence may be admitted in its place. In this case, however, defendant’s offer to stipulate cannot be considered available alternative evidence. Without the State’s agreement, there was no stipulation available to be admitted into evidence, and, as we have explained, the State was not required to stipulate to these facts.

Blum’s, Pavlik’s, and Haskell’s testimony was not admitted solely to inflame the passions of the jury. It was highly probative with respect to the identity of the body found in Hunting Area 7, the precise time of Christopher’s death, the manner and cause of his death, and the weapon used. In addition, the circuit court limited the prejudicial effect of this testimony by preventing Blum from testifying concerning the time Christopher may have suffered prior to his death and by not publishing photographs of the body to the jury after admitting them into evidence.

Defendant argues that the prejudicial effect of this testimony was demonstrated by (1) the fact that one juror asked the circuit court whether counseling was available for the jurors and (2) the fact that Christopher’s mother exited the courtroom during Blum’s testimony and was heard screaming in the hallway outside the courtroom. The record indicates that the juror who asked this question did so out of curiosity and stated that the testimony was not affecting his ability to serve. In addition, with respect to Christopher’s mother, the circuit court observed for the record that she left the courtroom discreetly and that subsequent noises in the hallway outside could not necessarily be attributed to her. Because the probative value of the State’s expert testimony concerning identity and the time and cause of death outweighed its prejudicial effect, we find no abuse of discretion in the admission of this testimony. See 
Bounds
, 171 Ill. 2d at 46 (photographs of the victim were properly admitted even though identity and cause of death were not disputed), citing 
People v. Speck
, 41 Ill. 2d 177, 201-04 (1968).

III. Sentencing

The remainder of our discussion concerns issues defendant raises with respect to the sentencing portion of his trial. He argues that he must receive a new sentencing hearing because (1) one of the aggravating factors considered by the jury was unconstitutional; (2) the verdict forms used at the eligibility stage were defective; (3) the circuit court erred in admitting certain photographs at both stages of the hearing; (4) the circuit court erred by refusing certain jury instructions submitted by defendant; (5) the State misstated the law regarding mercy in its rebuttal argument; (6) a death sentence is inappropriate because the State’s failed to provide defendant with adequate psychiatric care; and (7) the Illinois death penalty statute is unconstitutional.

A. Constitutionality of Section 9–1(b)(7)

We begin our discussion of these sentencing issues by addressing defendant’s argument that one of the aggravating factors the jury considered was unconstitutional. The jury found defendant eligible for the death penalty based on the following three statutory aggravating factors: (1) “the defendant has been convicted of murdering two or more individuals” (720 ILCS 5/9–1(b)(3) (West 1994)); (2) “the murdered individual was killed in the course of another felony” (aggravated kidnaping) (720 ILCS 5/9–1(b)(6) (West 1994)); and (3) “the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty” (720 ILCS 5/9–1(b)(7) (West 1994)).

Defendant argues that the “brutal or heinous” statutory aggravating factor contained in section 9–1(b)(7) of the death penalty statute is unconstitutionally vague on its face. Although, pursuant to Illinois Pattern Jury Instruction, Criminal, No. 7B.07 (Illinois Pattern Jury Instructions, Criminal, No. 7B.07 (3d ed. Supp. 1996)) (hereinafter IPI Criminal 3d 7B.07), the jury was instructed as to the meanings of “brutal” and “heinous,” defendant claims that these definitions were insufficient to cure the vagueness of this statutory aggravating factor. According to defendant, he must be resentenced because the jury found him eligible for the death penalty based on this unconstitutional factor and considered this factor at the aggravation-mitigation stage.

In other cases involving the same challenge defendant makes to section 9–1(b)(7), we have repeatedly upheld the validity of this aggravating factor. See, 
e.g
., 
People v. Jackson
, 182 Ill. 2d 30, 63 (1998); 
People v. Pulliam
, 176 Ill. 2d 261, 272 (1997); 
People v. Odle
, 128 Ill. 2d 111, 140-41 (1988); 
People v. Redd
, 173 Ill. 2d 1, 45-46 (1996); 
People v. Oaks
, 169 Ill. 2d 409, 460 (1996). We have also previously rejected defendant’s argument that the definitions of “brutal” and “heinous” contained in IPI Criminal 3d 7B.07 do not adequately define these terms. See 
People v. Redd
, 173 Ill. 2d 1, 46 (1996). Defendant presents us with no persuasive reason to reconsider these holdings and we decline to do so. We find no error with respect to the jury’s consideration of this aggravating factor.

B. Defective Eligibility Verdict Forms

Defendant also argues that he must receive a new sentencing hearing because the jury’s eligibility verdicts were legally insufficient. He claims that the verdict forms used at the eligibility stage omitted the necessary mental state with respect to two of the three statutory aggravating factors on which his eligibility was based.

To be eligible for the death penalty under section 9–1(b)(6), a defendant must have “acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another.” 720 ILCS 5/9–1(b)(6)(b) (West 1994). Similarly, to be eligible under section 9–1(b)(3), the defendant must have been convicted of murdering two or more individuals with the intent to kill or with the knowledge that his acts would “cause death or create a strong probability of death or great bodily harm.” 720 ILCS 5/9–1(b)(3) (West 1994).

In this case, these mental states were omitted from the verdict forms relating to defendant’s eligibility under section 9–1(b)(3) and section 9–1(b)(6). The forms stated:

“We, the jury, unanimously find beyond a reasonable doubt that the defendant Timothy Buss is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

The defendant was 18 years old or older at the time of the murder for which he was convicted in this case; and

The following statutory aggravating factor exists:

The defendant has been convicted of murdering two or more persons.

* * *

We, the jury, unanimously find beyond a reasonable doubt that the defendant Timothy Buss is eligible for a death sentence under the law. We unanimously find beyond a reasonable doubt that:

The defendant was 18 years old or older at the time of the murder for which he was convicted in this case; and

The following statutory aggravating factor exists:

The murdered person was killed in the course of aggravated kidnaping.”

Defendant is correct that these forms are invalid pursuant to our decision in 
People v. Mack
, 167 Ill. 2d 525 (1995). In that case, we held that a defendant was entitled to a new sentencing hearing because the verdict form, pursuant to which he was found eligible for the death penalty, omitted the requisite mental state. In 
Mack
, as in this case, the defendant’s eligibility was based on section 9–1(b)(6). The verdict form in 
Mack 
provided: “ ‘We, the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery.’ ” 
Mack
, 167 Ill. 2d at 529-30.

We found that the verdict in 
Mack 
was legally insufficient because the verdict form had omitted the mental state required for a finding of eligibility under section 9–1(b)(6)(b). We explained that a verdict need not set forth the specific elements of an offense so long as it is a general verdict. For example, a verdict that provides only that a defendant is “eligible” for the death penalty based on the existence of a “statutory aggravating factor” is a general verdict. 
Mack
, 167 Ill. 2d at 538; see also IPI Criminal 3d No. 7B.10. On the other hand, if the verdict form sets out some of the elements of an offense as specific findings, the form must do so completely. 
Mack
, 167 Ill. 2d at 537-38.

We held in 
Mack 
that the verdict at issue could not be considered a general verdict because the verdict form specified certain elements of the aggravating factor. Consequently, it was necessary for the verdict form to contain all essential elements of that aggravating factor. Because it omitted the requisite mental state for eligibility under section 9–1(b)(6), the verdict form was legally insufficient, and the verdict could not stand. Given that the defendant’s eligibility was based solely on section 9–1(b)(6), a new sentencing hearing was required. 
Mack
, 167 Ill. 2d at 538.

In the case before us, the State argues that the verdict forms were not invalid under 
Mack 
because they did not attempt to set forth all of the elements of the aggravating factors. In support of this argument, the State relies on our decision in 
People v. McNeal
, 175 Ill. 2d 335 (1997).

Our decision in 
McNeal 
does not, however, support the State’s position. In 
McNeal
, we held that the verdict forms pursuant to which the jury found the defendant guilty of first degree murder were not defective just because, in parentheses, they described the nature of the first degree murder charges. 
McNeal
, 175 Ill. 2d at 359-62. For example, one verdict form provided, “ ‘We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (knowing his acts created a strong probability of great bodily harm) of Corey Gerlach,’ ” while another provided, “ ‘We, the jury, find the defendant, Aldwin McNeal, Guilty of the offense of first degree murder (intended to kill) of Corey Gerlach.’ ” 
McNeal
, 175 Ill. 2d at 359-60. The defendant in that case complained that the verdict forms were defective under 
Mack 
because they contained some but not all of the essential elements of the offenses. We found, however, that, unlike the verdict form in 
Mack
, the verdict forms in 
McNeal 
did not attempt to set forth the essential statutory elements. Instead, the parenthetical material in the forms in 
McNeal 
merely identified by name the first degree murder charge at issue on a particular form. Therefore, the jury’s verdict in 
McNeal 
could be considered a general verdict and was not invalid. 
McNeal
, 175 Ill. 2d at 362.

Although, in 
McNeal
, we distinguished the language in the verdict forms from the language we found legally insufficient in 
Mack
, we are unable to make such a distinction in this case. There is no significant difference between the language of the verdict form at issue in 
Mack 
and the two at issue in the case at bar. The form in 
Mack 
and the forms in this case refer to the aggravating factors in similar terms. Under 
Mack
, therefore, the jury’s verdicts concerning defendant’s eligibility under section 9–1(b)(3) and section 9–1(b)(6) are legally insufficient.

Nevertheless, no new sentencing hearing is required. Although the verdict forms relating to defendant’s eligibility under section 9–1(b)(3) and section 9–1(b)(6) were defective due to the omission of the requisite mental state, the third verdict form, relating to defendant’s eligibility under section 9–1(b)(7), did not suffer from this flaw. It is well established by our recent case law that when a defendant is found eligible for the death penalty under multiple statutory aggravating factors, the eligibility finding may stand despite the invalidation of one of those factors, so long as there is a separate, valid aggravating factor that supports the defendant’s eligibility. See 
People v. Macri
, 185 Ill. 2d 1, 58 (1998);
 People v. Jackson
, 182 Ill. 2d 30, 69 (1998), citing 
People v. Brown
, 169 Ill. 2d 132, 165 (1996); 
People v. Williams
, 181 Ill. 2d 297, 321 (1998)
. 
In addition to finding defendant eligible for the death penalty based on the felony-murder and multiple-murder factors, the jury found him eligible under the separate “brutal and heinous” aggravating factor. As we have explained, this is a valid aggravating factor and supports the defendant’s eligibility for the death penalty, notwithstanding the invalid verdicts based on the other two aggravating factors.

We reject defendant’s contention that, even if we were to find him eligible under section 9–1(b)(7), we must grant him a new second stage sentencing hearing because the jury was improperly influenced at the aggravation-mitigation stage by the two improper aggravating factors.
 
We have previously rejected this argument by the defendant in 
People v. Williams
, 181 Ill. 2d 297 (1998). In that case, as in this one, the defendant was found eligible for the death penalty based on multiple aggravating factors. We determined that his eligibility under the felony-murder aggravating factor was invalid because the necessary mental state was omitted from the verdict form and the instructions involving that factor. 
Williams
, 181 Ill. 2d at 320. We nevertheless held that no new second stage sentencing hearing was required as a result of the jury’s consideration of this invalid aggravating factor. Even when a statutory aggravating factor is eliminated due to a defect in the verdict form and instructions, the jury is entitled to consider the defendant’s conduct relevant to that factor in deciding the appropriate sentence. 
Williams
, 181 Ill. 2d at 321-22.

In this case, there is no dispute as to the sufficiency of the evidence to support the felony-murder and multiple-murder aggravating factors. Under 
Williams
, therefore, evidence relating to these factors was properly considered by the jury, and no new sentencing hearing is required.

Defendant was properly found eligible for the death penalty pursuant to section 9–1(b)(7), and, although the eligibility verdicts based on section 9–1(b)(3) and 9–1(b)(6) were invalid, the jury was not precluded from considering evidence pertaining to these factors at the aggravation-mitigation phase of the sentencing hearing. Accordingly, a new sentencing hearing is not required. In addition, given our holding that the verdict finding defendant eligible for the death penalty under section 9–1(b)(3) cannot stand, we need not consider defendant’s argument that the application of the multiple-murder statutory aggravating factor in his case violated the eighth amendment to the United States Constitution.

C. Admission of Photographic Evidence

 Defendant further contends that resentencing is required because three photographs the circuit court admitted into evidence and published to the jury during the sentencing proceedings were unduly prejudicial. During the eligibility phase of the sentencing hearing, two photographs of Christopher’s torso, a front view and a rear view, were admitted into evidence and published to the jury. As defendant notes, the circuit court described the photographs as the “most gruesome things” it had ever seen. The pictures show stab and slash wounds to the body, as well as decomposition. The photograph depicting the front of Christopher’s torso shows the lower part of his face, including his teeth which are exposed due to decomposition. His genital area is not visible in the photographs.

At the sentence selection phase, the circuit court admitted into evidence these two photographs of Christopher, as well as a photograph of the body of Tara Sue Huffman, the young girl defendant had killed previously. This picture shows her lying in a field naked, except for a shirt pushed up around her chest. Her legs are spread, and there is a wooden stick protruding from what appears to be her rectum. There are no obvious wounds or other injuries to the body. At the jury’s request, these photographs were provided to the jury during deliberations.

We begin by discussing the admission of the two photographs of Christopher at the eligibility phase of sentencing. Defendant contends that he was denied a fair sentencing hearing by the admission of these photographs because they were cumulative of other evidence presented at the hearing, and their prejudicial effect outweighed their probative value.

The first phase of a sentencing hearing is intended to permit the jury to determine, without improper influence from potentially inflammatory evidence, whether a defendant is eligible for the death penalty. 
People v. Edgeston
, 157 Ill. 2d 201, 224
 
(1993). Consequently, only evidence that directly pertains to the statutory aggravating factors is admissible at this stage. 
People v. Hooper
, 172 Ill. 2d 64, 73 (1996). Photographs that are introduced solely to inflame the jury are not admissible. 
People v. Rissley
, 165 Ill. 2d 364, 405 (1995). However, if photographs are relevant to proving a defendant’s eligibility under a statutory aggravating factor, they may be admitted, even if they are gruesome, inflammatory, or disgusting. 
Rissley
, 165 Ill. 2d at 405. It is the function of the circuit court to determine which evidence should be admitted at this stage, and its decision will not be overturned absent an abuse of discretion. 
Edgeston
, 157 Ill. 2d at 224.

The photographs of Christopher’s body demonstrated the nature, location, and force of the stab wounds from which Christopher died. They were, therefore, highly probative of the “brutal and heinous” aggravating factor contained in section 9–1(b)(7). Although, as the circuit court stated, the photographs were “gruesome,” this is primarily because the crime was gruesome, and the jury was entitled to consider the character of the crime in determining defendant’s eligibility for the death penalty under section 9–1(b)(7) (720 ILCS 5/9–1(b)(7) (West 1994)).

Moreover, our review of the record indicates that the prejudicial effect of this evidence was minimized. The State had originally proposed that the jury view a third photograph of Christopher’s body, depicting his groin area. After the circuit court expressed concern that this photograph would be unduly inflammatory, the State withdrew the photograph. With respect to the other two photographs, the circuit court found that their probative value outweighed their prejudicial effect. As a result, the jury saw only two photographs of Christopher’s body, and while some decomposition is visible in these photographs, none of the insects with which the body was infested when it was discovered were evident.

Furthermore, contrary to defendant’s argument, the circuit court was not required to exclude the photographs merely because they were cumulative of testimony concerning the manner in which Christopher died. This court has previously explained that “demonstrative evidence may be clearer and more persuasive than oral testimony covering exactly the same points and has allowed the jury to view photographs of a crime victim even when the photographs simply depict what witnesses have orally described.” 
People v. Simms
, 143 Ill. 2d 154, 176-77 (1991). Accordingly, photographs submitted at the eligibility phase need not be excluded merely because they are cumulative of other evidence. 
People v. Edgeston
, 157 Ill. 2d 201, 225-26
 
(1993).

The photographs of Christopher were not admitted at eligibility solely to inflame the passions of the jury, and we agree with the circuit court that their probative value outweighed their prejudicial effect. Accordingly, it was not an abuse of discretion for the circuit court to admit them. See 
Simms
, 143 Ill. 2d at 175-79 (circuit court properly admitted photographs of decedent and bloodstains in her apartment at the first stage of the sentencing hearing; their prejudicial effect did not outweigh their probative value); 
Rissley
, 165 Ill. 2d at 405 (autopsy photographs of victim, even some depicting insect infestation of the body, were properly admitted at the eligibility stage of sentencing to show eligibility under section 9–1(b)(7); their prejudicial effect did not outweigh their probative value and the fact they were cumulative did not require them to be excluded).

We also find no error with respect to the admission of these two photographs, plus the photograph of Tara Sue Huffman, at the aggravation-mitigation stage of the sentencing hearing. These three photographs were admitted into evidence and published to the jury. In addition, at the jury’s request, they were sent to the jury during deliberations. Following the jury’s receipt of the photographs, it returned the verdict imposing the death penalty.
(footnote: 2)
 The rules of evidence applicable to trials do not apply to the aggravation-mitigation portion of a capital sentencing hearing because the trier of fact at sentencing “must possess the fullest information possible concerning the defendant’s life, character, criminal record, and the circumstances of the particular offense.” 
People v. Burton
, 184 Ill. 2d 1, 32 (1998). At this phase of sentencing, evidence is admissible so long as it is relevant and reliable. 
People v. Armstrong
, 183 Ill. 2d 130, 152 (1998). The determination as to the relevance and reliability of evidence is within the sound discretion of the trial judge. 
People v. Bounds
, 171 Ill. 2d 1, 62 (1995).

Evidence of a defendant’s prior violent criminal behavior is relevant aggravation because it bears on defendant’s character and likelihood of committing additional crimes. 
Simms
, 143 Ill. 2d at 179. Consequently, in several different cases, this court has held that the details of previous crimes committed by a defendant are admissible at the aggravation-mitigation phase of sentencing. See, 
e.g
., 
People v. Hope
, 168 Ill. 2d 1, 42 (1995) (testimony concerning the autopsy of another of defendant’s murder victims was properly admitted at the aggravation-mitigation stage of sentencing); 
Edgeston
, 157 Ill. 2d at 238 (tape of 911 call by previous murder victim of the defendant was properly admitted); 
Simms
, 143 Ill. 2d at 178-79 (testimony by defendant’s previous sexual assault victims properly admitted).

Defendant does not dispute that the photographs admitted at the aggravation-mitigation stage were relevant and reliable. Instead, he again argues that they should not have been admitted because they were too prejudicial and cumulative of testimony concerning the condition of Christopher’s and Tara Sue’s bodies. As we have explained with respect to the admission of photographic evidence at the eligibility stage, the fact that photographs are cumulative of other evidence does not require that they be excluded. This principle applies with equal force at the aggravation-mitigation stage, especially given the relaxed evidentiary standards at this stage. The jury had already seen the two photographs of Christopher at the eligibility stage. Only these two photographs and the photograph of Tara Sue were admitted at the second stage of the sentencing hearing. These photographs were relevant to show the violent nature of defendant’s criminal acts, and we find that the circuit court did not abuse its discretion in admitting them. 
People v. Franklin
, 135 Ill. 2d 78, 110-11 (1990) (murder scene photographs of defendant’s previous victim were properly admitted). We also find no error in the circuit court’s decision to grant the jury’s request to view the photographs during deliberations. See 
Bounds
, 171 Ill. 2d at 46-47 (no abuse of discretion to send jury photographs of victims during trial deliberations); 
People v. Mitchell
, 152 Ill. 2d 274, 338-39 (1992) (no abuse of discretion to permit jury to view life and death photographs during aggravation-mitigation deliberations).

D. Instructions at Aggravation-Mitigation

Defendant claims that he was denied a fair sentencing hearing for the additional reason that the circuit court refused to give the jury nonpattern instructions he submitted. As a result, he argues that a new sentencing hearing is required.

If the IPI instructions contain an applicable instruction on a subject about which the circuit court determines the jury should be instructed, the circuit court must use that instruction, unless the court determines that the instruction does not accurately state the law. 134 Ill. 2d R. 451(a). It is within the circuit court’s discretion to decide whether to give the jury a nonpattern instruction. 
People v. Gilliam
, 172 Ill. 2d 484, 519 (1996). If the subject matter of the refused nonpattern instruction is covered by pattern instruction or other instructions given by the circuit court, no abuse of discretion will be found. 
Gilliam
, 172 Ill. 2d at 519.

1. Mercy

According to defendant it was error for the circuit court to refuse his request to provide the jury with three nonpattern instructions concerning the jury’s power to consider mercy in determining the appropriate sentence for him. In one of these instructions, defendant proposed the addition of the following paragraph to IPI Criminal 3d No. 7C.01:

“There is nothing that prevents you from affording Timothy Buss mercy in these proceedings; and that such mercy, if based on the particular circumstances of the offense and the Defendant Timothy Buss, can constitute a mitigating factor sufficient to preclude the imposition of the death sentence.”

The circuit court also refused defendant’s requests to use two other nonpattern instructions concerning mercy. One informed the jury that “In considering the death penalty, you may, if you wish to do so, consider whether or not you wish to extend mercy to the Defendant.” The other provided:

“A mitigating circumstance is a fact about either the offense or about the defendant, which in fairness or in mercy, may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.

The appropriateness of the exercise of mercy is itself a mitigating factor you may consider in determining whether the State has proved that the death penalty is warranted.

You are also to consider as mitigating circumstances any other factors concerning the defendant that you find to be relevant.”

The circuit court refused these nonpattern instructions on the basis that the IPI instructions tendered by the State sufficiently instructed the jury on the subject.

According to defendant, the circuit court failed to recognize its discretion to modify the IPI instructions or, to the extent Supreme Court Rule 451(a) prevented the circuit court from modifying the pattern instructions in this case, it is unconstitutional because, without the modification, defendant was denied a fair sentencing hearing. Alternatively, defendant asserts that the circuit court abused its discretion in refusing his instructions. He argues that the instructions he submitted should have been provided to the jury because the IPI instructions failed to inform the jury that it could consider mercy and how to do so. He contends that, without his instructions on mercy, the jury was left “without adequate guidance as to the proper role of its mercy power.” As a result, defendant argues, he was denied his right to due process and the protections against cruel and unusual punishment under the fourteenth and eighth amendments to the United States Constitution. In addition, defendant asserts that his counsel was ineffective for failing to renew defendant’s request for a mercy instruction after this request was denied at the instruction conference.

As a preliminary matter, we cannot agree with defendant’s suggestion that the circuit court failed to recognize its discretion to modify the IPI instructions. At the instructions conference, defense counsel argued that it was within the court’s discretion to accept the modifications proposed by defendant. The circuit court responded, “I’m going to deny Defendant’s one. I will stick with the IPI 7C.01. It’s consistent with the Illinois Pattern Jury Instructions that have been set forth by the Illinois Supreme Court. I will follow them.” These statements indicate that the court recognized its power to modify the pattern instructions but chose not to do so because the subject matter of the refused instruction was covered by the IPI instructions. This was a proper exercise of discretion by the court.

While a jury may properly consider mercy as a factor at a capital sentencing hearing, mercy must be considered in the context of all aggravating and mitigating factors. 
Hope
, 168 Ill. 2d at 46-47. Consequently, it is well established by the precedent of this court that no specific instruction concerning mercy is required when a jury is instructed that it “should consider all circumstances that provide reasons for imposing a sentence other than death” (
Hope
, 168 Ill. 2d at 46-47). See, 
e.g
., 
People v. Miller
, 173 Ill. 2d 167, 198-99 (1996); 
People v. Sutherland
, 155 Ill. 2d 1, 29 (1992); 
People v. Simms
, 143 Ill. 2d 154, 182-83 (1991); 
People v. Lear
, 143 Ill. 2d 138, 151 (1991)
.

In this case, the jury was instructed:

“In deciding whether the defendant should be sentenced to death, you should consider all the aggravating factors supported by the evidence and all the mitigating factors supported by the evidence ***. Mitigating factors include: Any reason supported by the evidence why the defendant should not be sentenced to death. Where there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence.” See IPI Criminal 3d No. 7C.06.

This instruction permitted the jury to consider mercy, and, therefore, no additional specific instructions concerning this nonstatutory 
aggravating
 
mitigatin
g
 factor were required. See 
People v. Kidd
, 175 Ill. 2d 1, 50 (1996) (observing that this court has repeatedly rejected attempts by defendants to specify nonstatutory mitigating factors at the aggravation-mitigation stage).

Defendant asks us to overrule the cases in which we have held that no separate mercy instruction is required. We continue to agree with the reasoning of those cases, however, and find that defendant’s arguments do not support our rejection of that line of authority. Thus, the circuit court did not abuse its discretion in refusing defendant’s proposed instructions concerning mercy. In addition, given our holding that no specific instructions concerning mercy were required, we find no merit to defendant’s arguments that Rule 451(a) unconstitutionally restricted the circuit court’s ability to give such instructions and that defense counsel was ineffective for failing to renew defendant’s request for these instructions.

2. Unanimity

Defendant claims that the instructions at the aggravation-mitigation stage were also defective because of the circuit court’s refusal to give the jury two instructions he proposed concerning the unanimity requirement (see 720 ILCS 9–1(g) (West 1994)). He asked that the jury be instructed as follows: “There is no requirement that you reach a unanimous decision at this stage of the proceedings. If one or more of you have decided the defendant should not receive death, you may sign the verdict form without debate.” The second unanimity instruction defendant proposed provided: “If the jury or any juror determines that there are mitigating factors sufficient to preclude the imposition of the death sentence, then the Court shall not sentence the Defendant, Timothy Buss, to death.”

The circuit court refused to use these nonpattern instructions. Instead, it gave the jury the following IPI instruction:

“Under the law, the defendant shall be sentenced to death if you unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence.

If you are unable to find unanimously that there are no mitigating factors sufficient to preclude imposition of a death sentence, the court will impose a sentence of natural life imprisonment, and no person serving a sentence of natural life imprisonment can be paroled or released, except through an order by the Governor for executive clemency.” See IPI Criminal 3d No. 7C.05.

The jury was also instructed: “[Y]ou may not sign a verdict imposing a death sentence unless you unanimously vote for it” (see IPI Criminal 3d No. 7C.07), and “If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death” (see IPI Criminal 3d No. 7C.06).

According to defendant, the circuit court’s refusal of the unanimity instructions he proposed denied him a fair sentencing hearing because the IPI instructions provided to the jury did not give the jury a clear understanding of the unanimity rule. Defendant asserts that, because the circuit court refused his instructions, the jury was left with the mistaken belief that any verdict 
against 
the imposition of the death penalty also had to be unanimous.

Defendant’s challenge to the court’s refusal to give his unanimity instructions is without merit for several reasons. First, given that there were IPI instructions that addressed this subject, it was not an abuse of discretion for the court to refuse defendant’s nonpattern instructions. See 
Gilliam
, 172 Ill. 2d at 519. Indeed, after comparing the IPI instructions provided to the jury with defendant’s proposed instructions, we are unable to discern any clarification of the unanimity rule made by defendant’s instructions. In addition, this court has rejected the argument that the existing IPI instructions concerning the unanimity rule mislead the jury by suggesting that a verdict against the death penalty must be unanimous. 
Macri
, 185 Ill. 2d at 70. The refusal of defendant’s unanimity instructions did not deny defendant a fair sentencing hearing.

3. Standard of Proof

Defendant’s third challenge to the instructions provided to the jury at the aggravation-mitigation stage is that these instructions failed to correctly state the standard under which the jury may choose not to impose the death penalty. Although defendant’s argument is somewhat difficult to understand, it appears that his objection to the instructions provided in his case is that they “overstate[d] the mitigation required under state law to acquit of death” and failed to inform the jury that it had “unfettered discretion” in determining whether to impose the death penalty. He contends that the circuit court should have given the following instruction to the jury: “You may spare the defendant’s life for any reason you deem appropriate and satisfactory.”

The circuit court instead instructed the jury that, if it did not find that there were “no mitigating factors sufficient to preclude imposition of a death sentence,” the court would sentence the defendant to a sentence other than death. See IPI Criminal 3d No. 7C.05. In addition, the circuit court instructed the jury that a mitigating factor was “[a]ny reason supported by the evidence why the defendant should not be sentenced to death” and that “[w]here there is evidence of a mitigating factor, the fact that such mitigating factor is not a factor specifically listed in these instructions does not preclude your consideration of the evidence.” See IPI Criminal 3d No. 7C.06. As we have held in the past, these instructions accurately state the law with respect to the quantum of proof at the aggravation-mitigation hearing. See 
Gilliam
, 172 Ill. 2d at 520. Accordingly, we find no abuse of discretion in the court’s refusal of defendant’s instruction.

E. Rebuttal Argument

In addition to arguing that he was denied a fair second-stage sentencing hearing by the refusal of his instructions concerning mercy, defendant asserts that a new sentencing hearing is required because, during its rebuttal argument at the aggravation-mitigation stage, the State suggested that the jury could not consider mercy as a mitigating factor. Specifically, defendant complains about the following portion of the State’s rebuttal argument:

“[Defense counsel] talked quite a bit about sufficient mitigation, and he also talked at the same time about mercy. And I want you to understand and keep clear in your minds a distinction. And the distinction is this, the process of weighing mitigation is involved in applying the legal standards to this case and deciding whether there is sufficient or insufficient mitigation. And that’s your factual job to do. [Defense counsel] pleaded for mercy on behalf of his client. That has nothing to do with the laws of the State of Illinois. That is his right to do. It’s his right, a Defendant’s right, to basically ask you, the Jury, in effect to forget about the law. Please give me mercy. So there is two things going on. They are both legitimate. Both legitimate. But they are separate things that you have to keep in mind that are being requested of you. That is why I want to talk briefly about mitigation and the legal standards which you must apply in the weighing of whether or not the mitigation is sufficient or insufficient. Then I will talk about mercy and whether it’s appropriate.” 

According to defendant, the State misstated the law when it said that mercy “has nothing to do with the law[ ]” and that, by asking the jury to give him mercy, the defendant was asking it to “forget about the law.”

The State responds that defendant has waived this issue for review by failing to object to these comments at trial and by failing to raise them in his post trial motion. We agree with the State that defendant has waived this issue. See 
People v. Williams
, 181 Ill. 2d 297, 322 (1998) (an objection at the sentencing hearing and reference to the error in a post-sentencing motion is necessary to preserve a sentencing issue for review). Defendant replies that we may nevertheless review the issue pursuant to the doctrine of plain error. In addition, he argues that his counsel was ineffective for failing to object to these comments and that the circuit court should have corrected the prosecution’s misstatement of the law 
sua sponte.

Under the doctrine of plain error, a reviewing court may consider issues not properly preserved at trial if the evidence is closely balanced or if the error is so fundamental that it denies the defendant a fair trial. 
Macri
, 185 Ill. 2d at 40; 134 Ill. 2d R. 615(a). In this case, defendant satisfies neither of these requirements.

The evidence at the aggravation-mitigation stage was not closely balanced. The evidence presented in aggravation included testimony that, when defendant was in eighth grade, he choked a fifth-grader with a wire for no apparent reason. Subsequently, in 1981, when defendant was 13 years old, he was involved in the disappearance, sexual assault, and murder of five-year-old Tara Sue Huffman. Several hours after she was reported missing, her body was found two blocks from her home. Objects had been inserted into her vagina and anus. During his incarceration as a juvenile for the murder of Tara Sue Huffman, defendant was found in possession of a “shank,” a hacksaw blade, and a 25-pound weight that he was using to punch a hole through the wall of his cell.

After his release from prison for Tara Sue Huffman’s murder, defendant moved to Florida in the Fall of 1993. A former girlfriend of defendant testified that, in 1994, she and defendant lived in a crack house in Sarasota. To support themselves, they relied on money gained from shoplifting and checks the girlfriend received from the government because of her physical and mental disabilities. According to this girlfriend, defendant sexually abused her.

A subsequent girlfriend of defendant testified that she met defendant when she was 15 years old and working as a prostitute in Sarasota. She stated that defendant could not hold a job and made money selling cocaine and stolen fishing poles. Her testimony indicated that defendant also physically abused her. 
A Sarasota police officer who used defendant as a confidential informant confirmed that defendant was involved in selling crack cocaine.
 In addition to this testimony, a victim impact statement from Christopher’s mother was read to the jury.

As mitigation, the defense presented testimony by defendant’s stepmother, father, and grandmother. They explained that defendant’s mother left the family when defendant was in kindergarten. She did not seek custody and, when visits were arranged with the children, she would often fail to come for those visits. Defendant was loved by his father and grandmother, but they both had full-time jobs, and the children were often left in the care of different baby-sitters.

Defendant’s childhood baby-sitters and teachers described defendant as quiet, not violent, below-average academically, and immature as a child. Defendant also lacked social skills, and was teased by other children. They also testified concerning the negative effects of defendant’s mother’s abandonment on him. According to defendant’s elementary school principal, one month before defendant killed Tara Sue Huffman, defendant and his siblings went to a court hearing at which their mother said that she did not want the children. One baby-sitter also testified that defendant told her that, before she left, his mother had locked the children in their rooms and had chased them with a knife. 

Personnel from the Illinois Youth Center in Joliet, where defendant was incarcerated for the murder of Tara Sue Huffman, also described defendant as quiet and, in general, not a disciplinary problem. Instructors and a guard defendant knew after his transfer from the juvenile division to the adult division described him as immature but not a disciplinary problem. Although he was a slow student, he received his GED while in prison and became trained in automotive mechanics and welding.

When defendant moved to Florida, he first lived with a former baby-sitter and her husband for six months. She described defendant as immature but caring and responsible. He moved out because he ran out of money and could not pay his rent.

Defendant’s probation officer in Florida stated that defendant participated in counseling, but, because he had to pay for this counseling himself and provide his own transportation, he dropped out when finances and transportation became a problem. He worked only sporadically. She did not know defendant to become violent, but, in her opinion, he did not have the “tools” to make the right decisions for himself and, as a result, would become frustrated. A social worker who provided sex offender counseling for defendant stated that he did not seem violent but was immature and had low self-esteem.

Dr. Marvin Ziporyn, a psychiatrist, testified that he evaluated defendant in 1982, when defendant first entered the juvenile division of the Illinois Department of Corrections. Ziporyn diagnosed defendant with depression accompanied by tremendous rage, anger, and hostility. According to Ziporyn, defendant was emotionally deprived and, when his emotional needs were not met, he would likely respond by acting out his anger or turning it inward and becoming depressed. During his first few years in the juvenile division, he attempted suicide several times. Ziporyn recommended that defendant receive medication and six months of therapy with a particular therapist. Defendant received only three months of the recommended therapy. By 1984, defendant had improved and his medication was stopped. Ziporyn recommended further therapy, however, because he believed that defendant’s core problems remained. To Ziporyn’s knowledge, his recommendation was not followed. Ziporyn described defendant as a 12 on a scale of 1 to 10 for dangerousness and would not have recommended his release. Dr. Ziporyn admitted that he is no longer licensed as a doctor in Illinois.

Dr. Randy Zoot, a clinical psychologist who interviewed defendant and members of his family after Christopher’s murder, testified that defendant suffered from parental neglect, a lack of social skills, learning difficulties, and abnormal brain functioning because of a head injury as an infant. These problems left him with a limited ability to cope and problem solve, especially in emotionally charged circumstances. She observed that, although defendant received some counseling and medication when he first entered the juvenile division, it was not as much as the Department of Corrections’ own psychologist had recommended. In Zoot’s opinion, although defendant was able to function in the structured environment of the prison, he left prison with the same problems he had when he entered in 1982. Due to these problems, although defendant did not intend to harm anyone, he was unable to withhold inappropriate responses.

Dr. Michael Gelbort, a neuropsychologist who also evaluated defendant after Christopher’s murder, testified that defendant had a language-based learning disability, some brain dysfunction, and attention deficit disorder. As a result, defendant’s reasoning and judgment were distorted, especially under ambiguous or confusing circumstances. Although these neuropsychological defects could not be changed, defendant would have been “more likely” to lead a normal life if, at an early age, he had received treatment and been placed in an environment in which his choices were limited.

Based on this record, we do not believe that the evidence at the aggravation and mitigation stage of the sentencing hearing was closely balanced. Although evidence of defendant’s childhood is certainly tragic, it does not begin to explain why defendant committed the brutal crimes of which he has been convicted. In addition, even the purportedly mitigating evidence presented at the hearing indicates that there is little chance that defendant could be rehabilitated. Within the first few years following his release from prison for Tara Sue Huffman’s murder, he became involved in illegal activities, exhibited violent behavior toward his girlfriends, and committed a crime almost identical to the one for which he had previously been convicted. Also, although defendant exhibited little violent behavior while incarcerated, testimony by his own experts indicates that the explanation for this apparent improvement is the controlled environment of prison. According to even defendant’s own experts, he is dangerous to himself and others and suffers from neuropsychological problems that cannot be remedied.

With respect to the second prong of the plain error doctrine, we find that the State’s error did not deny defendant a fair sentencing hearing. Prosecutors are permitted wide latitude in their closing arguments, and comments during closing argument will not result in reversal unless they cause substantial prejudice to a defendant. 
People v. Hope
, 168 Ill. 2d 1, 26 (1995). In evaluating claims that remarks in closing arguments were erroneous, reviewing courts must consider these comments in the context of the parties’ arguments as a whole. 
People v. Burgess
, 176 Ill. 2d 289, 319 (1997). The propriety of closing argument is a matter within the sound discretion of the circuit court, and its determination will not be overturned absent an abuse of discretion. 
People v. Wiley
, 165 Ill. 2d 259, 294-95 (1995).

We agree with defendant that the portion of the State’s rebuttal argument he cites is improper. In this portion of its argument, the State makes a distinction between the jury’s weighing of mitigating evidence and its consideration of mercy. There is no such distinction in Illinois because, as we have held, mercy is a relevant mitigating factor. See, 
e.g
., 
Hope
, 168 Ill. 2d at 46-47; 
People v. Simms
, 143 Ill. 2d 154, 182 (1991). Thus, to the extent that the State’s argument suggested that the jury could not consider mercy as a mitigating factor, or that mercy differed from other mitigating factors, it was error.

Nevertheless, our review of the record convinces us that this error did not result in substantial prejudice to defendant. While certain comments by the prosecution may have suggested to the jury that it should not consider mercy as a mitigating factor, these comments were isolated and the remainder of its rebuttal argument made it clear that mercy was a relevant consideration. The prosecution stated repeatedly that mercy is a “legitimate” and potentially “appropriate” consideration. For example, it stated: “In the end, although mercy is an appropriate thing for the Defense to ask in every case, it’s appropriate, it’s your job as jurors to decide whether the object is a legitimate object of mercy.” Indeed, the fact that the defense argument was focused on mercy and the fact that the State devoted a substantial part of its rebuttal argument to explaining why defendant did not deserve mercy indicated to the jury that it had the power to factor mercy into its sentencing determination.

In addition, the jury was instructed that mitigating factors are “[a]ny reason supported by the evidence why the defendant should not be sentenced to death” and that “any statement or argument by the attorneys which is not based on the evidence should be disregarded.” See 
Hope
, 168 Ill. 2d at 26-27. In the context of the parties’ arguments as a whole and these instructions, we find that the State’s improper remarks did not deny defendant a fair sentencing hearing. For these reasons, we find no plain error. See 
People v. Richardson
, 123 Ill. 2d 322, 361 (1988) (the State’s rebuttal argument at sentencing did not result in plain error where the evidence was not closely balanced and substantial justice was not denied).

Alternatively, defendant argues that his counsel was ineffective for failing to object to the State’s argument concerning mercy. Defendant’s ineffective assistance of counsel claim is without merit because he has not demonstrated prejudice resulting from his counsel’s failure to object to the portion of the State’s rebuttal argument at issue. See 
Bull
, 185 Ill. 2d at 203. As we have explained, the improper remarks by the State were isolated. Also, in the context of the remainder of the State’s argument, the defense argument, and the circuit court’s instructions, these comments did not leave the jury with the mistaken belief that it could not consider mercy in determining the appropriate sentence for defendant. Accordingly, we reject defendant’s claim of ineffective assistance of counsel.

Finally, defendant asserts that the circuit court should have,
 sua sponte
, corrected the State’s error in its argument concerning the jury’s consideration of mercy. As the State observes, however, defendant cites no authority for this argument. Accordingly, it is waived. 155 Ill. 2d R. 341(e)(7); 
People v. Madej
, 177 Ill. 2d 116, 162 (1997).

F. Inadequate Psychiatric Care

Next, defendant contends that the death penalty is inappropriate in his case because the State negligently or recklessly failed to provide the psychiatric treatment that Dr. Ziporyn had recommended. As a result of the State’s failure to provide this treatment, defendant argues, he was unable to “work through” his anger and murdered Christopher because he could not control his emotions. In fact, defendant asserts that “[t]he instant case, in short, could have been prevented except for the negligence of the Department of Corrections.” On this basis, he requests that we vacate his death sentence.

It is the function of a capital sentencing jury to balance factors in aggravation and mitigation at the second stage of sentencing, and its decision “will not be overturned lightly, particularly where that decision is amply supported by the record.” 
People v. Hooper
, 172 Ill. 2d 64, 77 (1996). “Mitigation evidence of a defendant’s cognitive abilities and mental health does not preclude imposition of a death sentence when that evidence is outweighed by aggravating evidence.” 
People v. Pulliam
, 176 Ill. 2d 261, 286 (1997).

In this case, before deciding to impose the death penalty, the jury heard the evidence that defendant received less than all of the treatment recommended by Dr. Ziporyn. Other evidence presented at the aggravation-mitigation stage, however, indicated that defendant did receive some counseling and that additional treatment may have been of limited value, given that treatment could not rectify the brain dysfunction from which defendant suffered. In addition, the jury heard evidence concerning the details of defendant’s brutal murders of two children and his propensity for violence. Based on this record, we will not overturn the jury’s decision to sentence defendant to death. See, 
e.g
., 
Madej
, 177 Ill. 2d at 139-40 (mitigating evidence of the defendant’s cognitive difficulties, mental health, and abuse did not outweigh evidence in aggravation); 
Pulliam
, 176 Ill. 2d at 286 (the death penalty was appropriate for defendant’s murder and sexual abuse of a child despite mitigating evidence of the defendant’s depression, abuse as a child, anti-social personality disorder, and low IQ) .

G. Constitutionality of Death Penalty Statute

Lastly, defendant argues that the Illinois death penalty statute is unconstitutional. In previous cases, we have repeatedly rejected the arguments defendant makes here: (1) that the death penalty statute “requires the sentencer to adhere to an impermissibly high standard of acquittal of death” (see, 
e.g
., 
Macri
, 185 Ill. 2d at 77-78; 
People v. Jackson
, 182 Ill. 2d 30, 93-95 (1998)), (2) that the statutory scheme results in the arbitrary imposition of the death penalty (see, 
e.g
., 
People v. Williams
, 181 Ill. 2d 297, 333 (1998); 
People v. Brown
, 172 Ill. 2d 1, 62-63 (1996)), and (3) that the statute is unconstitutional because it permits the jury to consider the “vague” aggravating factor of “any other reason” why the defendant should be put to death (see, 
e.g.
, 
People v. Johnson
, 182 Ill. 2d 96, 112-13 (1998); 
People v. Hope
, 168 Ill. 2d 1, 48 (1995)). Defendant fails to present us with any new reason to persuade us to overturn our previous decisions on these issues. We, therefore, reject his constitutional challenge to the Illinois death penalty statute.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Will County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, September 14, 1999, as the date on which the sentence of death entered in the circuit court is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

Judgment affirmed.

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Timothy Buss’ convictions should be upheld. For the reasons set forth in my dissent in 
People v. Bull
, 185 Ill. 2d 179 (1998), however, this state’s present death penalty law does not meet the requirements of the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) or article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, §2). Accordingly, we should vacate Buss’ death sentence and remand the cause to the circuit court for imposition of a sentence of imprisonment. 720 ILCS 5/9–1(j) (West 1994). There is, however, no need for the circuit court to conduct another sentencing hearing. Under the circumstances of this case, the only authorized disposition is a term of natural life imprisonment. 730 ILCS 5/5–8–1(1)(b) (West 1994). 

 

FOOTNOTES
1:     
1
An amendment to Supreme Court Rule 431, effective May 1, 1997, added the requirement that the circuit court ask prospective jurors their views on these basic guarantees. See 177 Ill. 2d R. 431.

2:     
2
Defendant asserts that the jury returned a verdict just 10 minutes after receiving these pictures. We have been unable to find support for this claim in the record.